Filed 10/5/22  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORGE M. RODRIGUEZ,<br><br>Defendant and Appellant. | F080727<br><br>(Super. Ct. No. F14911320)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

At his first trial and on February 26, 2018, a jury acquitted defendant Jorge M. Rodriguez of first degree murder for his role in the deaths of Calvin Lamar Reese and Jose Nunez Duenas but failed to reach a verdict as to second degree murder charges. A separate jury convicted codefendant Gustavo Adolfo Duenas[1] of second degree murder as to both victims. On retrial, the jury convicted defendant of two counts of second degree murder, and on December 9, 2019, the trial court sentenced defendant to a term of 30 years to life in prison.

Defendant contends on appeal that (1) the trial court erred in failing to sua sponte instruct the jury as to the natural and probable consequences doctrine, (2) the trial court's instructions erroneously permitted the jury to find defendant aided and abetted murder based upon implied malice and without the specific intent to kill, and (3) the jury instructions permitted the jury to convict based upon imputed malice. In supplemental briefing, defendant contends that, although the jury was not instructed on the now defunct natural and probable consequences doctrine of imputed malice, he is entitled to a new trial because the instructions as a whole and the prosecutor's closing argument permitted the jury to convict on that basis.

The People respond that (1) the trial court had no duty to instruct on the natural and probable consequence principle of imputed malice because the prosecutor did not rely on this theory or argue it to the jury, (2) aiding and abetting murder based upon implied malice is still a valid legal theory although, in this case, the prosecutor argued that defendant had a specific intent to kill and did not rely upon implied malice, (3) the transferred intent instruction did not permit the jury to impute Gustavo's malice to

---

[1] We will refer to Gustavo Adolfo Duenas as Gustavo to avoid confusion with victim Jose Nunez Duenas, whom we shall refer to by his surname. No disrespect is intended.

defendant, and (4) the jury instructions did not permit defendant to be convicted on imputed malice.

We affirm the judgment.

## PROCEDURAL BACKGROUND

On May 4, 2016, the District Attorney of Fresno County filed an information charging defendant and Gustavo with the murder of Reese (Pen. Code, § 187, subd. (a);[2] count 1), the murder of Duenas (§ 187, subd. (a); count 2), and second degree robbery (§ 211; count 3).[3] As to both murder counts, the information alleged special circumstances that defendant and Gustavo committed more than one murder (§ 190.2, subd. (a)(3)) and were accomplices in the commission of robbery (§ 190.2, subd. (a)(17)). The information also alleged, as to counts 1 through 3, that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Defendant pled not guilty to the information and denied all other allegations.

Trial of defendant and Gustavo commenced on January 23, 2018.[4] During trial, the district attorney filed an amended information alleging only the two murder charges, each with the additional allegation of a murder-robbery special circumstance (§ 190.2, subd. (a)(17)) and an enhancement for personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)). The jury acquitted defendant of first degree murder on February 26, 2018, the seventeenth day of trial, but the trial court declared a mistrial the following day after the jury was unable to reach a verdict as to second degree murder.[5]

---

[2]    Undesignated statutory references are to the Penal Code.

[3]    Gustavo was also charged in count 4 with escape from custody (§ 836.6, subd. (b)).

[4]    The trial court impaneled separate juries for each defendant.

[5]    Gustavo's jury acquitted him of first degree murder and found him guilty of both counts of second degree murder.

Defendant's retrial commenced on August 30, 2018.  On the eleventh day of trial, September 18, 2018, the jury convicted defendant of both counts of second degree murder and found not true that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to two consecutive terms of 15 years to life on December 9, 2019, and ordered defendant to pay a $200 restitution fine (former § 1202.4), a $200 suspended parole revocation restitution fine (§ 1202.45), victim restitution (former § 1202.4, subd. (f)), $60 in criminal conviction assessments (Gov. Code, § 70373), and $80 in court operations assessments (§ 1465.8).

Defendant timely appealed on February 5, 2020.

## FACTS

### I.  Prosecution evidence.

#### A.  Law Enforcement Response to Apartments at East Balch and South Winery Avenues

Officers Miguel Archan and Michael Pierce, employed by the Fresno Police Department, received a domestic disturbance call at 540 South Winery Avenue, apartment 205 (the apartment), located at the corner of East Balch and South Winery Avenues (the corner), at approximately 6:31 p.m. on December 6, 2014.  They arrived at approximately 6:43 p.m.  The apartment was associated with the Duenas family, where Gustavo lived with his mother, and was located in the middle of 540 South Winery Avenue, facing the interior of the complex.

4.

The prosecution introduced exhibit 1, a diagram of the area prepared by crime scene technicians to assist the jury in understanding the testimony, which was admitted into evidence. We reproduce exhibit 1 here for the same reason:[6]



Duenas had been verbally abusive to his estranged wife, who lived at the apartment, and Duenas had refused to leave. Duenas was not armed. Archan previously responded to the apartment due to problems involving Duenas and resolved the prior calls by convincing Duenas to leave. That evening, Duenas's son, Gustavo, agreed to drive

_____

[6]    The circles in exhibit 1 represent the numbered stands assigned to mark evidence items by the crime scene technicians. As further described herein, the three circles underneath the 520 South Winery building (near the white truck registered to Gustavo) are numbered 1, 2, and 3. The circles on the sidewalk at the intersection are numbered 4 through 10 (the area where Duenas was lying). The circles in the middle of East Balch Avenue (the area where Reese was lying) are numbered 11 through 13.

Duenas from the area and left with the officers through the pedestrian walkway. Neither Archan nor Pierce saw where Duenas and Gustavo went thereafter.

Archan and Pierce drove from the location at 7:28 p.m. but received notice at 7:31 p.m. that shots had been fired at the same apartment complex. Archan did not hear the gunshots. Still only a couple of blocks away, the officers drove back down South Winery Avenue, returned to the area, and parked near the corner. While returning to the area, Pierce did not see anyone running from or otherwise leaving the area. According to Pierce, they parked almost directly in the intersection facing northeast, approximately 20 to 30 feet from the corner.

Individuals flagged down the officers and directed their attention to an African-American male, later identified as 25-year-old Reese, lying face down in the middle of the street on East Balch Avenue. The area surrounding Reese was very dark with some lighting around him. As Archan bent over Reese, a group of individuals pointed out another victim and Pierce responded to the second victim who was on the corner near some rocks.

Blood came from Reese's mouth and made a gargling noise, but he did not respond to Archan. Archan turned Reese over and saw a large amount of blood soaked into his chest and shoulder areas from two gunshot wounds.[7] Archan commenced CPR until another officer and emergency medical technicians arrived. Reese did not have a weapon.

According to Reese's fiancé of five years, Shanika C., she and Reese shared an apartment near the corner, east of the intersection on the south side of East Balch Avenue. At approximately 7:30 p.m., on December 6, 2014, Reese left the apartment to

---

[7] Archan reviewed photographs of the scene after the victims had been transported to the hospital that showed clothing in the road. Archan testified that he did not recall any clothing in the road and Reese was wearing his clothing when Archan first saw him. Emergency services likely removed Reese's clothes during treatment.

walk to the store to purchase something to drink.[8]  The store was just a few minutes away, and Shanika expected Reese to be back after approximately five minutes.[9]  Before Reese returned, Shanika heard two gunshots, and she went outside.  Her apartment faced East Balch Avenue, but she did not see anything and went back into her apartment to wait for Reese.  Upon observing police cars in the street, Shanika walked to the corner where she saw a commotion and an older man lying on the sidewalk (Duenas).  Shanika then noticed paramedics surrounding someone else in the street in the other direction.  She saw that it was Reese, but officers prevented her from getting close to him.  Shanika spoke with police and initially thought Reese's wallet had been taken, but she found the wallet in a Reese's sweatpants in her apartment a week or two later.  Later that evening, Shanika learned that Reese had died.

Upon arrival on scene, Pierce saw Reese lying in the street.  But as Pierce ran toward Reese, he heard screaming from other individuals and saw Duenas lying on the sidewalk, near some rocks.  Pierce ran to Duenas who was lying face down in an easterly direction and had been shot in the back of the head.  Pierce recognized Duenas, a Hispanic male approximately 50 to 60 years old, as the subject of the earlier domestic disturbance call at the apartment.  He could not detect a heartbeat and commenced CPR.  Pierce later secured the apartment for a more thorough search by other officers.  No firearms were found during the search.

Pierce observed one shell casing near Duenas's head that he left to be collected by the evidence technicians.  Both victims were transported from the scene.  Reese was

---

**8**    Shanika also testified that Reese had returned from work at a recycling business that day at approximately 2:00 or 3:00 p.m. and took a nap before leaving for the store.  She identified photographs of the clothing that Reese had been wearing, including a back brace which he was required to wear at work, although he did not usually wear it otherwise.

**9**    Terry S. testified that the store was two blocks away from where Reese was found.

pronounced dead at 8:56 p.m.  Duenas had no brain activity and was on life support to preserve his organs for donation.

### B. Crime Scene Investigation

Detective Daniel Vandersluis and crime scene technicians responded to East Balch and South Winery Avenues to investigate, diagram and photograph the area, and collect evidence.  During this time, no members of the public were permitted into the area and no vehicles were allowed to enter or leave.  The diagram of the crime scene (exhibit 1, *ante*, p. 5) includes the corner and reflects the buildings, the locations and license plates of the vehicles parked on the street, and the evidence stand numbers.

Evidence stands 4 through 10 were placed on the southeast side of the corner near the rocks where Duenas was found.  Technicians recovered the casing from a nine-millimeter bullet near the curb, indicated by stand 4.  Evidence stands 6 through 9 were placed on an embankment on the corner and close to a puddle of blood near the area where Duenas's head had been lying.  Technicians found a second nine-millimeter bullet casing, designated by stand 7 and made by the same manufacturer as the casing found at stand 4.  No fingerprints were found on either casing.  No additional casings, bullet strikes, or bullets were found during a later search of the crime scene.

Michael Appel testified that he analyzed firearm and toolmark evidence and firearm ammunition components as a senior criminalist with the Department of Justice.  He examined the two nine-millimeter casings and concluded that they were from the same firearm.

Technicians also found a tire jack handle near Duenas's body, indicated by evidence stand 6, and recovered DNA but no fingerprints from it.  Mindy Crow, another senior criminalist with the Department of Justice, identified Duenas's DNA on the handle.

Technicians recovered eyeglasses and folded currency from this area but were unable to recover any fingerprints from the money. Further away from the rock area, but on the same corner, technicians found a bullwhip, identified by stand 10.

Evidence stands 11, 12, and 13 indicate the location of clothing items found at the scene in the area of where Reese had been lying. Vandersluis observed blood, vomit, and the clothing in this area. The clothing items included athletic shoes, sweatpants, a cut T-shirt, back brace, and a hat. The clothing had been torn or cut off and was soaked in blood.

Crow examined Reese's clothing items to determine whether she could obtain DNA from someone other than Reese because she had been advised that someone may have spat on Reese. She developed DNA profiles for Reese from a sample of his blood and profiles for Gustavo and defendant from cells obtained from inside their mouths.

Crow examined Reese's sweatpants, shoes, black T-shirt, baseball cap, and plaid shirt. Due the presence of blood on the baseball cap, T-shirt, and plaid shirt, Crow was unable to obtain a DNA stain for comparison. Crow obtained three DNA stains from Reese's shoes and four DNA stains from his sweatpants. Crow was able to exclude defendant and Gustavo as contributing to one stain from the sweatpants, but due to the clarity of the other DNA stains, she was unable to interpret conclusively whose DNA was present.

Technicians photographed a white truck on South Winery Avenue, located just north of the apartment complex's main parking lot and a broken glass bottle located near the truck, identified by evidence stands 1 through 3. The truck was registered to Gustavo who was being investigated regarding his involvement in the crimes. Technicians observed a tire jack, indicated by stand 14, behind the front seat and within the cab area of the truck. Vandersluis removed the tire jack because a jack handle had been found near Duenas's body. Sergeant Adrian Alvarez, the primary Fresno Police Department detective on the case, compared the jack handle found near Duenas to the tire jack found

in Gustavo's white truck and determined that jack handle matched the tire jack. The truck was towed from the crime scene.

Vandersluis investigated the various lighting sources found throughout the crime scene and documented a total of 18 sources. The streets were illuminated with streetlights, which were all operational. The apartment complex buildings had attached lights at the door and patio areas, although the lights were controlled by the occupants so Vandersluis did not know if they were illuminated during the murders. On East Balch Avenue, the lights from the buildings did not illuminate the street. The only other light source was the apartment complex's sign located on the north side of the corner. The lighting conditions at the corner were sufficient to see objects in the roadway and he was able to identify other officers working in the area. The roadway on South Winery before reaching the corner was better lit than the roadway on East Balch Avenue after turning the corner.

Alvarez testified that the streetlight on the corner was sufficient to permit identification of individuals within 25 yards. As part of his duties, Alvarez requested that additional crime scene technicians respond to the crime scene and photograph the area during daylight hours. Additional photographs were taken specifically to obtain a view of the corner from the area where the white truck registered to Gustavo had been parked during the crime.

Vandersluis also identified surveillance cameras attached to the apartments and determined that they were not functioning. The manager of the apartment complex testified that they had been inoperative for several years.

C.    **Shooting Witnesses**

1.    *Miguel F.*

Miguel F. testified that on December 6, 2014, he was in the back seat of a vehicle with his brothers returning home after dinner. Miguel testified that they were traveling

10.

north on South Winery Avenue and then east on East Balch Avenue and identified the corner where the murders occurred from exhibit 1. He saw an African-American male (Reese) lying in the middle of the road on East Balch Avenue. Reese was lying face down. Miguel checked on Reese and observed blood and that Reese had a wound on his chest. Reese spoke and told Miguel that he was cold. Miguel testified that Reese was coughing and had also vomited. Miguel could not remember if he or his brothers had turned Reese over. After seeing the chest wound, Miguel called 911.

Miguel did not see a weapon near Reese and had not heard any gunshots. He did not see anyone else near Reese. Miguel did not see anyone walking or running in the area on East Balch Avenue when he arrived. Miguel never saw anyone remove anything from Reese, nor did anyone move Reese. Miguel did not know there was a second victim until after the police arrived.

### 2. Lucas E.

Lucas E. testified that he lived with his brother and stepfather in a second-floor apartment at 540 South Winery Avenue and identified the location in exhibit 1. Lucas was sitting on the couch in the living room when he heard the first shot on the night of the murders. He got up right away and went out to the balcony through the already-open sliding glass door and then heard the second shot. The two shots were very close together, only two or three seconds apart. He only heard two shots. The couch was next to the balcony door and he was outside within five seconds. His view from the balcony "look[ed] straight at" the corner.

Lucas saw a man he believed to be African-American (Reese) running and then drop and another man chasing him. The man stood over Reese, looked at him, kicked him, spat on him, and called him "a bitch ass nigga." Lucas viewed the man from an angle and could clearly see the man was holding a gun in his hand. The man stood on Reese's left side and did not have his back to Lucas.

11.

Lucas knew that the man spat on Reese because of the manner in which the man's head moved and the noise that resulted. Lucas knew the man kicked Reese because he saw the man's leg move and hit the torso. While Lucas observed the man looking down at Reese, he did not see the man ever reach his hands out to Reese's body.

Lucas testified that the man appeared Mexican, bald, thin, and in his early twenties and he wore a red shirt. The man had very short hair or no hair, but Lucas believed that the man had no hair. Lucas noticed a second man standing on the sidewalk but, because the man was standing outside of the light, Lucas could not see the second man very well. Lucas could see part of the second man's body and that allowed Lucas to conclude the individual was a man. The second man did not move into the light of the streetlight when he left. The second man was dressed similar to the first man, wearing a baggy shirt and pants or shorts. The second man on the sidewalk was slightly bigger than the first man standing over Reese. Lucas believed that second man might be Mexican as well, based upon his voice.

Lucas testified that the second man asked, "Did you get him?" The first man responded, "Yeah. Let's go." The second man on the sidewalk left first, followed by the first man who had been standing in the street by Reese, and they both ran in the same direction.

Lucas did not see Reese move at any point. After he lost sight of the two men, Lucas saw a few cars drive around Reese before seeing one car stop; someone got out and used their cell phone to call 911 for help. That individual was the first person to approach Reese after the two men left. Lucas continued to watch as the police and ambulances arrived. He never saw anyone take anything from Reese. Lucas learned later that a second individual had been shot on the corner, but he did not see that individual.

Using a diagram of the area, Lucas identified where Reese and the two men were located when Lucas first saw them and the path they used to leave. According to Lucas, Reese fell in the street at the corner. The prosecutor showed Lucas a photograph of the

area where Reese's body was actually located, but Lucas did not believe it was possible that Reese fell further past the corner. Defense counsel showed Lucas the location on the diagram where Reese's body had been found, but Lucas still believed Reese's body was closer to the corner.

Alvarez identified Lucas as a witness on December 11, 2014, after visiting every apartment that faced East Balch and South Winery Avenues. Lucas lived in apartment 202. Lucas appeared reluctant to speak with Alvarez but agreed to speak with Alvarez inside Lucas's apartment. At that time, Lucas described one of the suspects as a young, thin, bald, Hispanic male. Due to Lucas's reluctance to speak with Alvarez, Alvarez did not ask Lucas to go outside and show him where the events occurred.

### 3. Terry S.

Terry S.'s testimony was read into the record. Terry testified that he lived at the apartment complex at the time of the shooting, in apartment 103 at 4941 East Balch Avenue, as indicated in exhibit 1. While sitting on his couch, he heard two gunshots back to back, got up, went outside, and ran to the corner. Terry thought he heard a third shot as he was going outside. Terry saw an African-American man lying in the middle of East Balch Avenue and two people running away. According to Terry, the two individuals were both male, but he could not describe them further. The first man, closest to Reese, walked backwards and then turned and ran. He appeared to be light-skinned and had his right arm extended as if pointing, although Terry did not see if he had anything in his hands. The second man ran toward the gate or driveway on South Winery. Terry could not see him very well but thought he appeared bigger than the other man. Terry did not see the two men running together, they ran in different directions.

Terry testified that the police arrived approximately 10 minutes later. Someone turned Reese over to see if he was alive, but Reese did not move, and Terry believed that Reese was dead. Cars drove by and some stopped to avoid hitting Reese. Terry did not see anyone take anything either from or around Reese. Terry's sister came from the

13.

corner and told him that another individual had been shot and was lying by the rocks at the corner.

Alvarez testified that when he interviewed Terry, Terry described the direction the suspects ran differently than when he testified. During his testimony, Terry indicated that one suspect ran north from the corner and the other individual ran between the buildings on South Winery. When Alvarez interviewed Terry the day after the murder, Terry indicated that one of the suspects ran from the area of Reese's body westward through the pedestrian gate between the buildings on South Winery and the other suspect ran west and then south down South Winery.

### D.     Additional Investigation

#### 1.     *Gustavo's Text Messages from December 6, 2014*

Alvarez questioned Duenas's family members that evening, including Gustavo. Alvarez obtained a phone from Gustavo on the evening of the murders and requested that the contents be downloaded. He reviewed the contents of the download and also reviewed the contents of the phone itself. Several text messages were exchanged with Gustavo on December 6, 2014, between 1:33 and 3:06 p.m. In one such text message, Gustavo mentioned that he intended to do something with "Smoker George." A text thereafter stated, "Let's find stupid people to rob like the last time." Another text followed, "Got a nigga we can rob?" Alvarez did not obtain evidence that defendant was part of the text communications. The reference to "Smoker George" led Alvarez to believe that this was a nickname for defendant.

#### 2.     *Gunshot Residue*

Technician Matthew Shafer, employed by the Fresno Police Department, acquired a sample from Gustavo's hands the evening of the murders in order to test for gunshot residue (GSR). Using disks with a special adhesive, Shafer dabbed one disk along Gustavo's right hand along the index finger, web of the thumb, and thumb and then used

14.

the second disk to do the same on Gustavo's left hand. Department of Justice Senior Criminalist Berklee Akutagawa examined the disks to search for GSR. Akutagawa testified that microscopic particles originate from the primer in a cartridge when a firearm is fired. The primer ignites, causing the gunpowder to burn, creating pressure in the cartridge case that causes bullet to fly out of the cartridge. The bullet flies out in the primer, which has small metallic microscopic particles that travel in the vicinity of where the firearm is discharged. Akutagawa can detect these particles with an electron microscope and through X-ray analysis. She then attempts to detect whether those particles contain lead, barium, and antimony in a single particle.

Akutagawa examined the samples collected from Gustavo's hands. As to Gustavo's right hand, Akutagawa testified that she found three particles in the sample that contained two of the three elements she sought, but since both particles are commonly found in the environment, she could not conclude that the particles were GSR, only that they were consistent with GSR. Gustavo's left-hand sample contained seven particles that each contained all three elements, indicating GSR. Additionally, three or more particles indicate that the GSR was not caused by incidental contact such as might occur during transportation in a patrol vehicle. While seven particles are a "pretty decent amount," the presence of GSR cannot be used to conclude whether an individual fired a gun or stood near while the gun was fired. Many factors can affect how close someone must be to acquire GSR residue from someone firing a firearm, such as the ammunition, type of gun, and environment. An individual may acquire GSR by handling a firearm that was recently fired or was not cleaned well or handled sufficiently to remove particles from past firings. GSR particles, similar to many other natural substances, can fall off one's hands through regular activities such as handling paper, touching doorknobs, or putting your hands into your pockets.

### 3. *Defendant and Gustavo's Physical Appearance on December 6, 2014*

The prosecutor introduced into evidence defendant's photograph that had been taken when he was arrested by the Fresno Police Department on November 13, 2014, three weeks before the murder, and showed the length of defendant's hair on that date. The arrest record also indicated that defendant was five feet eight inches tall and weighed 130 pounds.[10] The photograph showed that defendant's hair was short.

The prosecutor also introduced into evidence photographs of Gustavo taken on December 6, 2014, after the murders. The photographs accurately depicted the length of Gustavo's hair and his physique on that day.

### 4. *Coroner's Findings*

#### a) **Calvin Lamar Reese**

Dr. Michael Chambliss, a forensic pathologist, performed the autopsy on Reese's body. He first X-rayed Reese's body and determined that no bullets remained inside. Chambliss identified an entrance gunshot wound in Reese's right clavicle, though it had been cut into during the surgical efforts to resuscitate Reese. Chambliss observed the exit wound on Reese's outer left shoulder. He also examined Reese's plaid shirt and detected tears and holes in the shirt that corresponded to the entrance and exit wounds on Reese's body.

---

**10** While this exhibit is not a part of the record on appeal, we note that the prosecutor advised the trial court, outside the presence of the jury, that the photograph demonstrated that defendant was thinner than Gustavo and had a "much closer [hair]cut" than Gustavo. The prosecutor used the photograph in his closing argument to argue that Lucas's description of the shooter more closely resembled defendant than Gustavo because defendant's hair was much shorter than Gustavo's and defendant was much thinner than Gustavo. He argued that of the two men, only defendant could have possibly been described as bald, and suggested that Lucas could have been mistaken as to that part of his description of the shooter. The prosecutor also argued that someone with hair as short as defendant's as depicted in the November 13, 2014 photograph might appear bald when viewed at an angle, similar to Gustavo's close-cropped hair as depicted in his arrest photograph three weeks after the murder.

During his internal examination of Reese, Chambliss determined that the bullet passed through the muscles in Reese's right shoulder, traveled beneath the clavicle, struck large blood vessels coming from the aorta, (the subclavian artery and right common carotid artery), traveled to the inside of the left clavicle, injured the left common carotid artery coming from heart, moved to the muscles at the top of the left shoulder, and exited the outer portion of the left arm. Chambliss cleaned the entrance gunshot wound, removed the sutures from hospital procedures, and determined that it was, in fact, the entrance wound due to the blackening he observed on the skin near the wound. The bullet entered Reese's body approximately two inches higher than it exited, reflecting a downward angle. However, the angle could have been caused by rigor mortis, which affects accuracy in measuring the body, or because the bullet deflected through the muscle. The position of Reese's body when hit by the bullet also affected the trajectory of the bullet.

Chambliss testified that he did not see powder or soot tattooing around the wound, which indicated the bullet was fired from a distance of more than 36 inches. Though the wound was washed during the surgical procedure, Chambliss still expected to see some gunpowder grains in the wound, but he could not be absolutely sure. An individual's clothing can also filter gunpowder and prevent its appearance on the skin. Due to the many variables, Chambliss could not opine as to the angle of the firearm when it was fired or the position of Reese when he was hit by the bullet.

If a gun is fired close enough, Chambliss would expect to see gunpowder deposit on clothing near the bullet entrance and blackening of the clothing would occur if the bullet were fired up to one foot away. But if the firearm is more than 12 inches from the entry wound, it becomes more difficult to detect gun powder on clothing. Chambliss did not see any blackening on Reese's clothing around the bullet holes, although the color of the shirt and the amount of blood prevented him from being sure that the clothing was free of gunpowder. He concluded that absence of GSR on both the skin and shirt

17.

indicated that the gun was fired from a distance of more than 36 inches, but he could not absolutely make that conclusion in light of the limitations of his examination.

Chambliss also observed abrasions on Reese's face, left knee, and right hand. Reese had abrasions near his hairline, the outer corner of his left eyebrow, his cheek bone (lateral to his eye), the upper portion of his mouth, and his chin. These abrasions, as well as the abrasion on Reese's left knee, were consistent with falling on the pavement. Chambliss identified additional abrasions on the third and fourth fingers of Reese's left hand, on the knuckles near the nails, which might have been due to a fall but not necessarily so. Another abrasion was located on the fifth finger of Reese's right hand, starting below the knuckle and ending at the bottom of the fingernail. While opining that the facial abrasions were not caused by a metal object, Chambliss recognized the possibility that the abrasions on Reese's hands could have been caused by a defensive response to being hit with a metal weapon.

Chambliss concluded that Reese died due to injuries to the thoracic aorta caused by a gunshot wound to the right shoulder and the manner of death was homicide.

### b)      Jose Nunez Duenas

Dr. Venu Gopal, chief forensic pathologist at the Fresno County Coroner's Office, performed the autopsy on Duenas's body. During an external examination of Duenas, Gopal observed a gunshot entrance wound in the hairline on the back of Duenas's head, behind the left ear, approximately $63^{1}/_{2}$ inches up from the left heel[11] and two and one-half inches from the midline of his head. The bullet exited through the right side of Duenas's face, approximately 64 inches from the heel and two and one-half inches from the midline of his head. Because the distance from the heel of both wounds was almost the same and insignificant, Gopal concluded that the bullet traveled horizontally and

---

[11]      Gopal also testified that the wound was located $62^{1}/_{2}$ inches from the left heel and the record is unclear as to which measurement was accurate.

18.

slightly left to right through Duenas's head.[12]  The bullet was of a medium caliber, either .380 or nine-millimeter.

Gopal's internal examination revealed that the bullet, upon entering Duenas's head, traveled through the back of his skull, then through the left lobe of the cerebellum and the brainstem, through the right maxillary bone, and exited through the right side of Duenas's face.  A person who suffers this type of injury can collapse and die rapidly. Gopal detected no other injuries to Duenas's body, including his hands.

Gopal testified that the entrance wound did not exhibit any stippling, that is, powder tattooing caused by burned or unburned gunpowder.  The lack of stippling indicated that the muzzle of the gun was at least 24 inches, but most likely 30 to 36 inches and beyond, from the surface of the skin when fired.  Clear skin surrounding the entrance wound is indicative of a distant gunshot wound.

Gopal concluded that Duenas was killed by the perforation of his brain due to a gunshot wound to his head and classified it as a homicide.  Because the entrance wound was more than 30 inches from Duenas's head and behind his left ear, Gopal concluded that the wound was not self-inflicted.

### E.    Defendant's Statement

Alvarez interviewed defendant on August 24, 2015.  The interview was both audio and video recorded, and, because of a break during the interview, introduced into evidence as two different exhibits.  Alvarez and Detective David Fenstermaker interviewed defendant in the homicide interview room at the Fresno Police Department headquarters.[13]

---

[12]    Gopal explained that his examination only described the bullet's path with reference to the anatomy of the body and he could not determine the angle of the gun or position of Duenas's body when he was shot.

[13]    The appellate record does not contain the recording of defendant's interview, but we describe the interview from the transcripts provided to the jury that are included in this court's record.

Defendant told detectives that he was 19 years old and did not have a phone of his own, although he used his girlfriend's phone at times. Alvarez asked defendant if he knew why he was arrested. Defendant replied that officers showed him a picture of a "black … male" and he told the officers that he did not know the individual.

Defendant identified Gustavo as his "homie" whom he had met through a friend four years earlier. Defendant told the detectives that he did not hang out "much" with Gustavo and they did not get in trouble together. Defendant then asked, "Now I see what this is—'cause you said homicide and you showed me a picture of him [referring to either Reese or Duenas]. What do I have to do with?" When the detective told defendant that he knew defendant had been present during the murder, defendant replied, "Yeah[,] I was there."

Defendant explained that Gustavo and Duenas had an argument earlier in the day and the police arrived at the apartment. Defendant was not at the apartment when the police arrived because Gustavo had told him to wait outside on some benches because Gustavo was " 'having some family problems.' " Defendant continued, "So when all that was done," "that's when I met [Gustavo] again." "So he gets in the car—get in the car and we just leave. We thought that the—the dad wasn't there anymore but we seen [*sic*] him and then we just stopped right there."[14]

---

**14** Defendant described the car as a Honda Civic by Gustavo or Duenas. Exhibit 83 does not appear to indicate where defendant and Gustavo stopped the Honda after first trying to leave.

Alvarez and defendant prepared a diagram (exhibit 83) together based upon defendant's description of the events that transpired the evening of the murders (set forth below):[15]



The street running vertically on the diagram is labeled "BALCH," and the horizontal street is labeled "WINERY." A convenience store is located south of the apartment complex as shown in the lower right corner of exhibit 83. Defendant also described the entrance to the parking lot for the apartment complex off South Winery (in the lower right corner to the left of the box indicating the convenience store in exhibit 83). Defendant indicated that grass and some rocks are located to the right of the entrance.[16]

---

[15]    Alvarez testified that exhibit 83 was the diagram created during defendant's interview.

[16]    The rocks are shown in exhibit 83 as circles underneath the box labeled "Honda."

21.

Defendant explained in more detail that after the "family problems" were over, defendant met Gustavo again when defendant came outside with Duenas. Defendant and Gustavo got into the Honda Civic that was parked south of the entrance to the parking lot on South Winery and across from near where Duenas was sitting on some rocks. Defendant was in the front passenger seat and Gustavo was in the driver's seat. Duenas's white truck was parked behind them on the other side of the parking entrance. Duenas was talking to Gustavo through the passenger window when they saw Reese.

Defendant explained, "[T]his black person [Reese] just passed us by. And like he's looking. Like he just stares at us and then, um, I don't know. I don't know why [Gustavo] did that but he said, 'What's up?' And [Reese] he just like—I don't know. He didn't say nothing. We [*sic*] just walked behind the car and then I guess he—he had a gun on him 'cause—'cause he—he—when … Gustavo had said, 'What's up,' he got mad—that guy." "And so he runs across the street. And this is the part where I, um, have a lot of-I can't remember about this part that much. I can't remember what words were said or anything. But let me get to the point .…" "Um, when the argument stopped and I just had told [Gustavo], 'Just leave it alone. Don't—why you even, um say 'what's up' for? Just leave him alone.' And so [Reese] he's walking on the other side of the street—that way. [Duenas] is following him on the other side of the street." "And, um, like when [Duenas] gets to like right here he crosses the street. There's a van parked right here."[17] "You know it's a green van." "Right on the corner. And we were still in the car. I didn't—when we were still in the car I was looking at, um, Gustavo like why isn't he like getting off or like his dad is going towards [Reese]. And then all—he—he's not like—'cause if it was my dad I would've got off and—'cause I don't want nothing to happen to my dad." "Knowing that [Reese] has a gun."

---

**17** The green van is represented by a rectangle labeled "GRN VAN," located at the corner depicted in exhibit 83.

Defendant saw Duenas cross the street near the green van. He said, "Gustavo already knew [Reese] had a gun. And like the dad wasn't satisfied of—'cause if—are you a dad?" "Would you—if anything like that happened would you be satisfied of some—like a threat to your son? And just let it walk away?" Defendant clarified that Reese did not display a gun, but as Reese walked behind the Honda, he reached toward his waist and then walked to the other side of the street. The green van prevented defendant from seeing anything else after Duenas crossed the street.

Defendant said that he heard the gunshots but neither he nor Gustavo saw what happened. Gustavo did not get out of the car even after the gunshots, and defendant told him to get out. Gustavo then got out but did not see his father on the ground. Defendant approached the corner slower than Gustavo. Defendant repeated that they did not know who shot Duenas because the green van obstructed their view.

Alvarez asked defendant to explain the argument between Reese and Gustavo in more detail. Defendant said that Reese was walking past them on the sidewalk and was staring at them with a hard and "muggy" face; defendant told Gustavo, "Just leave it alone." Gustavo said, "What's up?" and then Reese walked behind the Honda. As he was passing the car, Reese reached toward his waistband. Defendant looked back as Reese walked behind the car, and Gustavo looked back through the rearview mirror. Gustavo stopped talking to his father at that time, and defendant concluded that Duenas most likely saw Reese reach toward his waist. Defendant believed "that's why [Duenas], um, went after [Reese] on the other side of the street."

Defendant said that Reese crossed the street and drew a red line on the diagram from the back of the Honda, across the street, and behind a car parked on that side of the street as indicated in exhibit 83. Once Reese stepped behind the car parked on the other side of the street, Reese said, "So what? Nothing's gonna happen?" Defendant first claimed that he did not know whether Gustavo carried a gun. Alvarez expressed disbelief and defendant replied, "I know he—he does [carry a gun] but I—I don't know if he did

23.

have one or not at that point." Defendant finally agreed that "they did carry guns with them." When asked to describe Gustavo's gun, defendant replied that he just wanted "it to end" and neither he nor Gustavo had anything to do with the murders.

Alvarez expressed appreciation for defendant's cooperation and asked how Gustavo responded when Reese asked if something was going to happen. Defendant responded, "Okay. Okay look. I, um, I'll correct myself. Gustavo did have a gun. Um, I just—like I said we were just at the wrong place at the wrong time." Defendant repeated that he and Gustavo were still in the Honda when they heard shots and that he encouraged Gustavo to get out of the car. Gustavo ran "over there" while defendant jogged down the middle of the street.[18] Defendant saw Duenas on the ground in the dirt on the corner and Reese was on the street, "on this side over here."

Alvarez reminded defendant that he had said that he wanted to correct himself regarding whether Gustavo had a gun and asked, "[A]t what point did you see him pull that out?" Defendant responded that Gustavo reached for the gun under his seat before Reese stood behind the car across from them and Reese saw Gustavo reach for something, which caused Reese to stand behind the car across from them. Defendant saw the gun after Gustavo pulled it out from under his seat, but Gustavo did not show it to Reese. Defendant told the detectives that Gustavo did not show the gun to Reese but, Gustavo "was just like ready—ready—someone's gonna go down." When Reese asked if something was going to happen, Gustavo essentially responded that he intended to mind his own business, and Reese started to walk toward the corner.[19] However, Duenas followed right behind at a distance.

---

**18** Exhibit 83 shows a red line from the passenger side of the car that stops just before the intersection (consistent with defendant's description of his path) and a second red line originating from the driver side of the Honda, down the opposite sidewalk and ending on the other side of the corner (consistent with the description of Gustavo's path). (See *ante*, at p. 21.)

**19** According to the interview transcript, defendant used a red marker to show Reese's path from behind their car to the sidewalk near the car across the street from their Honda.

24.

Defendant repeated his claim that neither he nor Gustavo saw anything when the gunshots started. Defendant told Gustavo to get out of the car, Gustavo ran to Reese, and "[t]hat's where [Gustavo] had like he—he—did wrong." But when Alvarez asked what Reese was doing, defendant explained that Reese was on the ground and denied that defendant or Gustavo had shot Reese. Defendant said that while walking to the corner he saw a Mexican male ducking and running from the area of the gunshots. Defendant explained that neither he, Gustavo, nor Duenas knew the individual, but that Duenas had problems with someone in the apartments the day before. While defendant did not see Reese and Duenas get shot, he suggested that the Mexican male could have taken advantage of the situation.

Alvarez confronted defendant with the evidence that demonstrated the green van was not parked at the corner and that his own observations and photographs established that the view from the parking lot entrance to the corner was not obstructed by any vehicle.[20] Alvarez also told defendant that the witnesses saw only two other people on the corner besides Reese and Duenas and did not see a third person.

Defendant explained that after Gustavo ran up to Reese with his gun, Gustavo kicked Reese, spat on him, and said something. Defendant also claimed that Gustavo took Reese's gun but did not shoot Reese. Defendant said he followed Gustavo when Gustavo ran to the car. Defendant insisted that someone else shot both men and acknowledged that he struggled with coming forward once he learned that Gustavo had been charged.

After a break, Alvarez resumed defendant's interview and emphasized the importance of defendant telling the truth. Defendant then told detectives that Duenas shot Reese and Reese shot Duenas. Gustavo collected both Reese and Duenas's guns.

---

[20] Alvarez testified that the view to the corner from Gustavo's truck was not impeded by the presence of a green van, contrary to defendant's statement.

Defendant explained that he did not see Reese and Duenas shoot each other but that he saw Gustavo collect both guns. Alvarez told defendant that it could not have happened that way because Duenas was shot in the back of the head. The detectives also pointed out that if Reese and Duenas had shot each other, why would defendant not have come forward with that information. Defendant explained that Gustavo would have gotten into trouble for taking the firearms from the scene. The detectives expressed their disbelief in the explanation. Defendant responded, "Okay, Detective. It was him." "It was him." Defendant explained that he told Gustavo to get out of the car before they heard the gunshots. Defendant walked slowly and followed Gustavo. Defendant said Reese shot Duenas and Gustavo shot Reese as Reese ran away. Gustavo took Reese's gun and went back to the car, but defendant did not get into the car and decided to walk home.

Detectives told defendant that they checked surveillance cameras of surrounding businesses and defendant said, "I don't know why I lie like that." He admitted that he left in Gustavo's car and accompanied Gustavo to Gustavo's uncle's place to leave the guns. Defendant stated that Gustavo had not seen Duenas on the ground but questioned why Gustavo would kill Reese if he was unaware that Reese shot his father. Defendant drew an "X" on the corner in exhibit 83 to show where Gustavo was standing when he shot Reese and a line to show the path to where Reese had fallen and where Gustavo kicked Reese and took Reese's gun. Defendant used a circle to indicate where he was standing in the street.

Alvarez asked what defendant's street name is and whether defendant had conversations with Gustavo about stealing from somebody. Defendant replied, "Yeah, yeah, I did—I did message him that, 'cause we just wanted to come up," and agreed that the term "come up" means "take from others—steal." Defendant said, "Um, yeah. That's where we were headed," and that they were in the car to leave for that reason. Defendant denied that they intended to steal from Reese. The detectives told defendant that Gustavo's text messages clearly expressed that he intended to commit robbery ("do

26.

some licks"). Defendant agreed that he told Gustavo, "Let's go come up," which meant to obtain money. However, defendant denied that he ever stole from anyone previously even though he discussed it with Gustavo.

Alvarez read several of Gustavo's text messages, including a message to "do it the same way we did it last time," and, "We're gonna go do the same thing." Defendant admitted that Gustavo had told him that Gustavo had gotten away with stealing before, but that night would have been the first time for defendant. Defendant then corrected himself and admitted that it was going to be his second time. Defendant said that he previously stole from cars and not from people. Defendant admitted that Gustavo was trying to convince him to rob people that night, but he "wasn't feeling it" and tried to convince Gustavo just to steal objects.

When asked what type of gun Duenas possessed, defendant replied, "The dad didn't have no gun," and agreed that Gustavo only took two guns to his uncle's place. Defendant lied when he said there were three guns in order to support his version of events, that Reese and Duenas had shot each other.

## II. Defense evidence.

### A. Ruben H.

Ruben H. testified that he lived at the apartments on East Balch and South Winery Avenues. Ruben had returned from taking his family to dinner and parked his white truck on the street.[21] Ruben was on the sidewalk removing tools from his truck while his wife waited in the truck and his daughter sat on the grass. The area was not well lit, but he saw two men greet each other at the corner, approximately 40 feet from him. One man wore a sombrero and the other man was African-American. The man wearing the

---

[21] We infer that the truck was parked on East Balch Avenue near where Reese collapsed given Ruben's later testimony. The record indicates that Ruben testified while referring to exhibit 1, but the record does not indicate where he pointed to on exhibit 1.

sombrero faced toward South Winery Avenue, with his back toward Ruben, and the other man faced the opposite direction.

Ruben initially thought the two men were hugging, but then he heard two shots and saw sparks or fire "coming out from within them." Ruben testified that it appeared the men were struggling. The man in the sombrero fell immediately to his knees and the other man started running toward Ruben's truck. Ruben picked up his daughter from the grass, put her in the truck with his wife, and told them to get down. During that time, he did not see either of the men. He did not see anyone else when the shooting occurred but indicated some areas near the shooting were dark and it was difficult to see. When the man that ran toward his truck fell to the ground, Ruben immediately took his family out of the truck and ran into his apartment. Ruben returned to his truck a few minutes later to close the truck door and did not see anyone else near either man.

Ruben initially told the police that he did not see anything but eventually agreed to meet with detectives and describe what he saw. The men were hugging when he saw the sparks and, though he did not see that either man had a gun, Ruben assumed they shot each other because he did not see anyone else.

### B.    Sergeant Adrian Alvarez Recall

Alvarez testified that he did not believe defendant when defendant said that Reese and Duenas shot each other, even though Alvarez had already interviewed Ruben and learned Ruben believed they shot each other. Alvarez also testified that Gustavo's phone had other text message threads, in addition to those he used in questioning defendant, that discussed the commission of robberies, but Alvarez could not identify the other parties to those messages.

## III.    Prosecution rebuttal evidence.

Dr. Venu Gopal testified that the physical evidence was inconsistent with a scenario where Reese and Duenas shot each other during a struggle because the entrance

wound at the back of Duenas's head showed no evidence of stippling, which meant the muzzle of the gun was at least 30 to 36 inches from the back of Duenas's head. Furthermore, the angle of the bullet through Duenas's head was inconsistent with being shot by Reese while in a bearhug with Reese. Finally, if Duenas was hugging Reese and shot him in the chest, Gopal would expect to see stippling on Reese's skin of the entrance wound and the clothing.

## DISCUSSION

**I.    The jury instructions did not permit the jury to convict defendant by imputing Duenas's malice to defendant.**

In supplemental briefing, defendant contends that, although the jury was not instructed on the now defunct natural and probable consequences doctrine of imputed malice, he is entitled to a new trial because the instructions as a whole and the prosecutor's closing argument permitted the jury to convict on that basis. The People argue that jury instructions did not permit the jury to convict defendant unless they agreed defendant either killed the victims or directly aided and abetted Gustavo to do so.[22]

---

[22]    We reject the People's argument that defendant's claim of instructional error was not preserved for appeal because defense counsel neither objected to, nor sought modification of, the instructions at trial. Especially given the changes in the murder law since defendant's trial, an appellate court may review any instruction, even when there was no objection or request for modification below, " 'if the substantial rights of the defendant were affected thereby.' " (*People v. Johnson* (2016) 62 Cal.4th 600, 638, quoting § 1259.) Because defendant contends that instructions allowed the jury to convict him of second degree murder based on the mental state of the perpetrator and without considering defendant's own mental state, we assume that defendant's challenge to the instructions was not forfeited for lack of objection and reach the merits of his claim. (See *id*. at pp. 638–639.)

## A.    Background

### 1.    *The Trial Court's Instructions*

The trial court instructed the jury pursuant to an instruction titled "Theory of offense" (boldface omitted) as follows:[23]

> "In order to find the defendant guilty of the crime of murder the People must prove beyond a reasonable doubt the defendant, Jorge Rodriguez, was either the perpetrator of the murder or aided and abetted the perpetrator in the commission of the murder.  You do not need to all agree on the same theory, that is, whether the defendant was the perpetrator or aided and abetted the perpetrator, but you all must unanimously agree that he was either the perpetrator or aided and abetted the perpetrator of the murder.

> "Let me read that.  I flipped some words.  But you must all unanimously agree he was either the perpetrator or aided and abetted the perpetrator of the murder."

The trial court also instructed the jury pursuant to a modified version of CALCRIM No. 400 (Aiding and Abetting: General Principles) as follows:

> "A person may be guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.  A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator. *Under some circumstances if the evidence establishes aiding and abetting of one crime a person may be found guilty of other crimes that occurred during the commission of the first crime.*"  (Italics added.)

The italicized language above is contained within a bracketed paragraph in CALCRIM No. 400.  Bench Note to CALCRIM No. 400 provides:  "If the prosecution is also relying on the natural and probable consequences doctrine, the court should also instruct with the last bracketed paragraph."  (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 400, p. 153.)  The note further advises to instruct

---

[23]    We note that while the trial court asked the parties to voice any objection to the proposed instructions on the record, the record does not include in-chambers discussions that would assist us in understanding how the court and parties selected the proposed instructions.

with CALCRIM No. 401 (or the aiding and abetting instruction) if the prosecution theory is that defendant intended to aid and abet the crime or crimes charged and CALCRIM No. 402 or 403 if the prosecution's theory is that any of the crimes charged were committed as a natural and probable consequence of the target crime.  (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 400, pp. 153–154.)  In this case, the trial court instructed the jury pursuant to a modified version of CALCRIM No. 401 (Aiding and Abetting: Intended Crimes) as follows:

> "To prove the defendant is guilty of a crime based on an [*sic*] aiding and abetting that crime, the People must prove that one, the perpetrator committed the crime; two, the defendant knew the perpetrator intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of that crime.

> "Someone aids and abets a crime if he knows of the perpetrator's wrongful purpose and he specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

> "If all of these requirements are proved the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor.  If you conclude the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact the person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider or abettor."

The trial court did not instruct the jury as to CALCRIM No. 402 (Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)  nor CALCRIM No. 403 (Natural and Probable Consequences (Only Non-Target Offense Charged)).  Bench Note to CALCRIM No. 403 provides that the trial court must instruct on any target offense relied upon by the prosecution as a predicate offense when substantial evidence supports the theory.  (Judicial Council of Cal., Crim. Jury Instns.

31.

(2020) Bench Notes to CALCRIM No. 403, p. 165.) The trial court only instructed the jury on the elements of murder and not any other offense.

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 500 (Homicide: General Principles) as follows:

> "Homicide is the killing of one human being by another. Murder is a type of homicide. The defendant is charged with murder. I will instruct you on the different types of murder."

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 520 (First or Second Degree Murder With Malice Aforethought (Pen. Code, § 187)) as follows:

> "The defendant is charged in Counts One and Two with murder in violation of Penal Code Section 187. To prove the defendant's guilty of this crime the People must prove that the defendant committed an act that caused the death of another person; and when the defendant acted he had a state of mind called malice aforethought. There[ are] two kinds of malice aforethought, express and implied malice. Proof of either is sufficient to establish the state of mind required for murder.
>
> "The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if he intentionally committed an act; the natural and probable consequences of the act were dangerous to human life; at the time he acted he knew his act was dangerous to human life; and he deliberately acted with conscious disregard for human life.
>
> "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. If you decide the defendant committed murder it is murder of the second-degree."

Finally, the trial court also instructed the jury pursuant to a modified version of CALCRIM No. 562 (Transferred Intent) as follows:

> "If a defendant intended to kill one person or intended to aid and abet a perpetrator to kill that person, but by mistake or accident someone else was also killed, then the crime, if any, is the same for the unintended

32.

killing of that other person as it is for the intentional kill[ing] of the intended victim."

## 2. *The Prosecutor's Closing Argument*

The prosecutor, in closing argument, argued primarily that defendant intentionally shot Reese and also intentionally killed Duenas relying on the doctrine of transferred intent. He explained that express malice in the unlawful intent to kill and "[i]f you point a gun at someone and pull the trigger, you are doing that to kill them.… When you point the gun at them and pull the trigger—so by doing so here we've shown intent to kill."[24] The prosecutor also explained that if you point a gun at someone and pull the trigger, the natural and probable consequence of that is dangerous to human life and is implied malice if defendant knows that. The prosecutor stated, "[P]eople know that. That's just one of those simple straightforward things." Reese was "shot right in the chest. Right here. That's an intent to kill." He later argued, "And all you are being asked to do is to find that yes, there's an intent to kill here."

In arguing that defendant was the perpetrator, the prosecutor relied upon Lucas's description of the shooter as bald and thin. Since only defendant and Gustavo were present when Reese and Duenas were killed and no one would describe Gustavo as either bald or thin, the evidence demonstrated that defendant had the firearm and shot Reese and Duenas. The prosecutor also argued that defendant's intent to kill was demonstrated by his actions in kicking and spitting at Reese and by Gustavo's question, "Did you get him?" and defendant's response, "Yeah. Let's go." Those statements also indicated they were working together, as did their flight from the scene.

The prosecutor told the jurors that he was asking them to conclude that defendant was the shooter and that defendant pulled the trigger that night. But if the jurors did not unanimously agree defendant was the actual shooter, they could still convict if all jurors

---

**24** The prosecutor then argued to the jury that defendant also killed Duenas and his intent to kill Reese transferred to Duenas as well.

concluded defendant either murdered the victims or aided and abetted the murders. He then explained that Gustavo's actions are important only insofar as the jury concluded that Gustavo was the perpetrator. When addressing aiding and abetting as a theory of liability, the prosecutor argued:

> "What [Gustavo] did that night, you only look at that insofar as it is his connection to [defendant]. Why [defendant] was there[?] Which one of these two did that? And here is where the aiding and abetting comes into play. [¶] I'm going to go through this doctrine. And I'm going to be just very up front with you on this. I'm asking you to find, and I believe the evidence is showing, that [defendant] was the shooter here. But you are the ones who have to make that decision. I don't make that call. You are the jury. You get to make that call.

> "So what happened? Okay. Well, these guys are clearly both involved. What happens if one or more of us is not convinced that [defendant] is the shooter here? What do we do then? What happens? That's where this aiding and abetting comes in. [¶] So I want to make it very clear. Again, my request is that you find [defendant] the shooter here. But you'll make the decision."

The prosecutor argued, "Sometimes it is impossible to know who did what. But you know people are acting together in concert to commit a crime."

The prosecutor asked the jury to assume that Gustavo pulled the trigger as the perpetrator. Defendant would be guilty if defendant knew that Gustavo intended to commit that crime, if defendant intended to assist Gustavo, and if defendant did assist Gustavo before or during the crime. The prosecutor argued that Gustavo leaned over Reese to make sure that he had been shot and, before he died and while the crime was still being committed, kicked and spat on him while defendant encouraged Gustavo by asking, "Did you get him?" The prosecutor argued, "That's [*sic*] the words of someone who is aiding and abetting. Encouraging, instigating, promoting. Person by [Reese] says yeah. And one of them says let's go. And then they run off at that same time. Those are all the facts showing that these two are acting together. They are aiding and abetting each other."

34.

The prosecutor addressed defendant and Gustavo's plans to steal or rob that evening as evidence of their motive in shooting Reese. He also acknowledged the uncertainty as to whether Duenas was involved with defendant and Gustavo, "There's certainly evidence to point to that he was involved somehow with these two younger men and going after [Reese]. But what that was, whether it was related to the stealing from [Reese], whether it was related to some type of retaliation for words that were exchanged, we don't know." The prosecutor later argued:

> "Sometimes we don't know exactly why things happen. We know what happened, but we don't know exactly why something happened. We don't always get every answer. [Defendant] certainly is not going to be the trustworthy source. We know that from listening to him. Were they trying to steal from [Reese]? Were they somehow retaliating from this lone man walking down the street because of some words? We might not know. Can have suspicions which one of these it was, but we may not know."

In reviewing the considerations for determining whether defendant aided and abetted a crime, the prosecutor catalogued several factors including defendant's presence at the scene, defendant's failure to prevent the crime, the statement "Did you get him?" which indicates a shared expectation that Reese would be shot, the statement "Let's go," which indicates working together, and defendant's flight with Gustavo without calling for help for either Reese or Duenas.

The prosecutor also used defendant's admission that he and Gustavo intended to steal later that evening as evidence that they were working in concert during the shooting, as evidence of aiding and abetting. The prosecutor argued that defendant and Gustavo were acting in concert before the shooting and this indicated they were doing so when Reese and Duenas were killed, whether they killed Reese to steal from him or to retaliate for the argument with Gustavo. "The significance of these is this: It's important to know why those two were together. What were they doing? What were they up to? And were they acting together? Were they partners that night? That's the key question." The

prosecutor argued that defendant's plans to commit a crime with Gustavo was evidence they were acting in concert during the shooting.  In rebuttal, the prosecutor argued:

> "[W]e may not know exactly why this happened.  The robbery and the testimony and the evidence about that is significant to show [defendant] and [Gustavo] were acting together.  Those two were partners out there.  That is the basic significance of the testimony.

> "We don't know if this happened because words were exchanged and this is some kind of retaliation; if this is [] Reese is an easy target because he's walking alone down the street and try to rob him.  Ultimately it doesn't really matter."

## B.      Standard of Review and Applicable Law

### 1.      Senate Bills Nos. 1437 and 775

After defendant's trial, our Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder.  (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 839, 842–843, superseded in other part by statute, as stated in *People v. Birdsall* (2022) 77 Cal.App.5th 859, 866, fn. 19 (*Gentile*).)  As relevant here, Senate Bill 1437 added section 188, subdivision (a)(3), which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime."  (Stats. 2018, ch. 1015, § 2.)  As amended, section 188 "bars a conviction for first or second degree murder under a natural and probable consequences theory."  (*Gentile*, at p. 846.)  Senate Bill 1437 also added former section 1170.95 (now § 1172.6), which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing.[25]

---

[25]      This provision was originally codified as section 1170.95.  After the Supreme Court's decision in *People v. Lewis*, *supra*, 11 Cal.5th 952, the Legislature amended section 1170.95 to adopt certain of *Lewis*'s holdings.  (See Stats. 2021, ch. 551, § 1, subd. (b).)  Effective June 30,

After briefing was complete in this case, the Legislature enacted Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), which expanded the remedies created by Senate Bill 1437 to attempted murder and changed Senate Bill 1437 in one respect relevant here. Effective January 1, 2022, Senate Bill 775 added subdivision (g) to former section 1170.95 (now§ 1172.6). (Stats. 2021, ch. 551, § 2.) Section 1172.6, subdivision (g) provides in pertinent part: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 .…" Section 1172.6, subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal (see *Gentile*, *supra*, 10 Cal.5th at p. 839) and allows defendant to challenge the validity of his conviction under the amended law in this appeal. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584, review granted July 27, 2022, S274792; *People v. Hola* (2022) 77 Cal.App.5th 362, 369–370.)

There is no dispute that defendant's appeal was not final when Senate Bill 775 took effect, and therefore the amendments apply retroactively to him.[26] (See, e.g., *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007.) Defendant is entitled to challenge the validity of his conviction based on changes to section 188 and whether he was convicted "under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subds. (a), (g); see *People v. Langi* (2022) 73 Cal.App.5th 972, 980 (*Langi*) [describing § 1172.6, subd. (a) as broadening scope of statute to any "other

---

2022, the Legislature later renumbered the provision without substantive change. (Stats. 2022, ch. 58, § 10.)

[26]     Because this matter remains on direct appeal, any remedy would be the possibility of retrial, rather than resentencing under section 1172.6. (*People v. Hola*, *supra*, 77 Cal.App.5th at p. 373.)

37.

theory under which malice is imputed to a person based solely on that person's participation in a crime"].)

### 2. *Standard of Review*

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here, the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, first bracketed insertion added.) " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) We also review the instructions as a whole and presume that jurors are intelligent and able to understand and correlate the trial court's instructions to the facts of the case. (*People v. Carey* (2007) 41 Cal.4th 109, 130.)

" 'All persons concerned in the commission of a crime, … whether they directly commit the act constituting the offense, or aid and abet in its commission, … are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. [Citation.] Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as 'vicarious.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117 (*McCoy*).) "But, as we explain, the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a

38.

combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state."[27] (*Id*. at p. 1117.)

"[A]n aider and abettor's mental state must be at least that required of the direct perpetrator. 'To prove that a defendant is an accomplice … the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ([*People v. Beeman* (1984) 35 Cal.3d 547,] 560, italics in original.) When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense— murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, *supra*, 25 Cal.4th at p. 1118, fn. omitted, second bracketed insertion in original.)

"Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, [he or] she says in essence, "your acts are my acts …." ' [Citation.] But that person's own acts are also [his or] her acts for which [he or] she is also liable. Moreover, that person's mental state is [his or] her own; [he or] she is liable for [his or] her mens rea, not the other person's." (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)

---

[27]   *McCoy* recognized two types of aiding and abetting liability for criminal conduct, referring to aiding and abetting an intended crime and " 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted,' " but only addressed aiding and abetting an intended crime because the jury had not been instructed as to the latter. (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)

" '[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime [the target offense], but also "[of] any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*People v. Chiu* (2014) 59 Cal.4th 155, 158, superseded by statute as stated in *Gentile*, *supra*, 10 Cal.5th at p. 849.)  Under direct aiding and abetting principles, an aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Beeman*, *supra*, 35 Cal.3d at p. 561.)  However, if these elements are met with regards to an intended or target crime, the aider and abettor is also criminally responsible where (4) the defendant's accomplice committed an offense other than the target crime, and (5) the offense committed by the accomplice was a natural and probable consequence of the target crime that the defendant aided and abetted.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 262 (*Prettyman*).)

"Unlike direct aiding and abetting liability, culpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent.  Instead, '[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature' and ' "is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense" ' may not be intended at all." (*Gentile*, *supra*, 10 Cal.5th at p. 844.)

To return a guilty verdict using an implied malice theory, the jury must make an individualized assessment of each defendant's mental state.  "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296–297.) Unlike the natural and probable consequences doctrine, the implied malice theory of murder "requires that the prosecution demonstrate the defendant in fact acted with malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106.)  "[T]he state of mind of a

40.

person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)

We next review whether the trial court's instructions permitted the jury to dispense with a determination as to defendant's subjective awareness of the risk to human life necessary for a finding of implied malice.

## C. Analysis

### 1. Error Related to CALCRIM No. 400

In accordance with CALCRIM No. 400, the trial court instructed the jury that defendant would be guilty if he directly committed the crime as the perpetrator or if he aided and abetted a perpetrator who directly committed the crime. However, the trial court's instruction also included the following paragraph:

> "Under some circumstances if the evidence establishes aiding and abetting of one crime, a person may be found guilty of other crimes that occurred during the commission of the first crime."

This was error as that bracketed paragraph is intended to be used only when instructing the jury on the natural and probable consequence doctrine and should also be accompanied by either CALCRIM No. 402 or 403. (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 400, p. 153.) ["If the prosecution is also relying on the natural and probable consequences doctrine, the court should also instruct with the last bracketed paragraph."].) In this case, the trial court instructed with CALCRIM No. 401 because the prosecution's theory was that defendant intended to aid and abet the crime or crimes charged. (See Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 400, p. 153.) While CALCRIM No. 400's bracketed paragraph indicated that someone may be guilty of other crimes committed during the commission of one crime, the trial court never instructed the jury with CALCRIM No. 402 or 403, which contain the natural and probable consequences

doctrine. The jury was provided no other instruction as to the circumstances where aiding and abetting one offense would make one responsible for other crimes committed during the first crime. Defendant acknowledges that fact but argues that the trial court's inclusion of the bracketed portion in combination with the prosecutor's statements in closing arguments could have led the jury to find him guilty of second degree murder on a natural and probable consequences theory.

In the context of this case, we cannot conclude that the jury would have interpreted this instruction as permitting it to determine whether a robbery had been committed, whether defendant aided and abetted that robbery, and whether murder was a natural and probable consequence of the robbery. First, the trial court instructed the jury that it needed to decide only whether defendant perpetrated a murder or aided and abetted the perpetrator to murder. The trial court also only instructed the jury as to the elements for murder and not any other crime.

Second, the trial court specifically limited the theory of the offense to murder when it instructed the jury that defendant would be guilty of murder if he perpetrated the murders himself or aided and abetted the perpetrator to murder. Therefore, when referring to "the crime" in CALCRIM No. 401, a reasonable jury would understand the court's instructions to refer to murder when it instructed:

> "To prove the defendant is guilty of a crime based on an aiding and abetting that crime, the People must prove that one, the perpetrator committed the crime [the murders]; two, the defendant knew the perpetrator intended to commit the crime [the murders]; three, before or during the commission of the crime [the murders] the defendant intended to aid and abet the perpetrator in committing the crime [the murders]; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of that crime [murder]."

Therefore, we cannot conclude that the jury would have interpreted reference to "the crime" in CALCRIM No. 401 to refer to any crime but murder.

42.

Furthermore, while the bracketed paragraph in CALCRIM No. 400 stated that "[u]nder some circumstances," a defendant who aided and abetted one offense may be guilty of another offense, the trial court's instructions did not include any reference to the natural and probable consequences doctrine or even the offense of robbery. While judges and lawyers familiar with the natural and probable consequences doctrine would understand the bracketed paragraph to be an introduction to that legal concept, we do not believe that the jury would have used that paragraph to conclude that a defendant aiding and abetting robbery is culpable for murder without additional instruction.

Moreover, in the context of the instructions as a whole, if the jury was attempting to ascertain the circumstances where aiding and abetting one crime permits a person to be found guilty of other crimes that occurred during the commission of the first crime, it would have likely concluded the trial court was referring to the transferred intent instruction. The trial court instructed the jury, in accordance with CALCRIM No. 562, that if defendant intended to kill one person or intended to aid and abet a perpetrator to kill that person, defendant is also guilty of murder if someone else is killed by mistake or accident during the intended killing. " 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' " (*People v. Bland* (2002) 28 Cal.4th 313, 320–321; see *id*. at p. 323 [" '[T]here is no requirement of an unlawful intent to kill *an intended victim*. The law speaks in terms of an unlawful intent to kill *a* person, not *the* person *intended to be killed*.' "].)

We agree with the People that the jury would have interpreted the bracketed paragraph of CALCRIM No. 400 with relation to this instruction. The transferred intent instruction, by its terms, applies only if the jury found that defendant intended to kill or

43.

intended to aid and abet the perpetrator to kill. The doctrine of transferred intent has nothing to do with the natural and probable consequences theory of aider and abettor liability. (See *People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1024.)

In reviewing the prosecutor's closing argument, we find no support for defendant's claim that it permitted the jury to convict without regard to defendant's own malice. The prosecutor argued several times that the evidence proved defendant fired the fatal shots and his intent to kill was demonstrated by having shot Reese directly in the chest, chasing Reese thereafter to ensure Reese had been hit, responding affirmatively when asked, "Did you get him?" kicking, spitting, and cussing at Reese, and fleeing as Reese died. The prosecutor argued that pointing a gun at someone and pulling the trigger evidenced an intent to kill. Even while explaining that pointing a gun and pulling the trigger is dangerous to human life, and defendant would know that because "[p]eople know that," and "[t]hat's just one of those simple straightforward things," the prosecutor argued implied malice was not applicable because shooting someone in the chest, "[t]hat's an intent to kill."

The prosecutor recognized that not all jurors might conclude defendant was the perpetrator and addressed aiding and abetting for any juror that believed Gustavo fired the fatal shots. However, the prosecutor never argued that defendant was guilty of murder because he aided and abetted a robbery and murder is a natural and probable consequence of robbery. The prosecutor asked the jury to assume that Gustavo pulled the trigger as the perpetrator. Defendant would be guilty if defendant knew that Gustavo intended to commit that crime, if defendant intended to assist Gustavo, and if defendant did assist Gustavo before or during the crime. The prosecutor argued that Gustavo leaned over Reese to make sure that he had been shot and, before he died and while the crime was still being committed, kicked and spat on him while defendant encouraged Gustavo by asking, "Did you get him?" The prosecutor further argued, "That's [*sic*] the words of someone who is aiding and abetting. Encouraging, instigating, promoting. Person by

44.

[Reese] says yeah. And one of them says let's go. And then they run off at that same time. Those are all the facts showing that these two are acting together. They are aiding and abetting each other."

In reviewing the considerations for determining whether defendant aided and abetted a crime, the prosecutor catalogued several factors including defendant's presence at the scene, defendant's failure to prevent the crime, the question, "Did you get him?" which indicates a shared expectation that Reese would be shot, the statement, "Let's go," which indicates working together, and defendant's flight with Gustavo without calling for help for either Reese or Duenas.

Nor did the prosecutor's closing argument invite the jury to convict defendant of murder because he aided and abetted a robbery. The prosecutor relied upon the fact that defendant and Gustavo intended to act in concert to steal or rob as evidence that they were acting in concert during the shooting, whether they killed Reese to steal from him or to retaliate for the argument with Gustavo, and argued, "The significance of these is this: It's important to know why those two were together. What were they doing? What were they up to? And were they acting together? Were they partners that night? That's the key question." Contrary to defendant's argument, the prosecutor did not argue that defendant aided and abetted the crime of robbery and murder was a natural and probable consequence of the robbery.

The prosecutor addressed defendant and Gustavo's plan to steal or rob on the evening of the murders as evidence of their motive in the intentional shooting of Reese, but even then, the prosecutor acknowledged the uncertainty of knowing "whether [their motive] was related to the stealing from [Reese], whether it was related to some type of retaliation for words that were exchanged, we don't know." The prosecutor explained that sometimes it is not possible to explain why things happen: "Were they trying to steal from [Reese]? Were they somehow retaliating from this lone man walking down the

45.

street because of some words?  We might not know.  Can have suspicions which one of these it was, but we may not know."

We agree with the People that the bracketed paragraph in CALCRIM No. 400 alone would not have been a basis for the jury to find defendant guilty of murder because defendant may have intended to commit another crime with Gustavo.  At best, the paragraph introduced ambiguity into the instructions by referencing some circumstances where a defendant who commits one crime could be responsible for another crime.  However, we cannot conclude that a jury would interpret the aiding and abetting instruction to refer to the crime of robbery, and not murder.  Even if the jury believed that defendant's motive for murder might be robbery, the instructions only permitted conviction under an aiding and abetting theory if defendant aided and abetted murder.

Moreover, we presume a jury understands and follows the court's instructions, and " 'treat[s] the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate ….' "  (*People v. Cortez* (2016) 63 Cal.4th 101, 131.)  Here, the trial court advised the jury, pursuant to CALCRIM No. 200, to follow its instructions even if counsel's comments conflicted with those instructions or the jury disagreed with the court's instructions.  The court then instructed the jurors that they could find defendant guilty of murder only if they found "beyond a reasonable doubt that defendant was either the perpetrator of the murder or aided and abetted the perpetrator in the commission of the murder."

We find support for our conclusion in *Prettyman*.  In that case, the trial court instructed the jury with these words:  " 'One who aids and abets is not only guilty of the particular crime aided and abetted, but is also liable for the natural and probable consequences of the crimes they abet.' "  (*Prettyman*, *supra*, 14 Cal.4th 248 at p. 272.)  The trial court in that case, unlike the instant case, also instructed, " 'You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether any other crime charged was a natural and probable consequence of such originally

contemplated crime.' " (*Ibid.*)  The Supreme Court recognized that because the trial court failed to identify the target crime that had been originally contemplated by the aider and abettor, the jury may have engaged " 'in unguided speculation.' " (*Ibid.*)

However, " 'in reviewing an ambiguous instruction …, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Prettyman*, *supra*, 14 Cal.4th at p. 272.)  There is no federal constitutional error where there is no " 'reasonable likelihood' " that the jury misapplied the trial court's instructions.  (*Ibid.*)  The Supreme Court noted that none of the parties mentioned this instruction in their closing arguments to the jury.  (*Ibid.*)  The prosecutor, in closing arguments, argued that the defendant was guilty as an aider and abettor to murder, the charged offense, and not because she facilitated or assisted some predicate offense of which murder was the natural and probable consequence.  (*Ibid.*)  Neither did the defense mention the " 'natural and probable consequences' doctrine" in its argument to the jury.  (*Ibid.*)  "Because the parties made no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted [the] defendant .…" (*Prettyman*, at p. 273.)

The Supreme Court also found the error harmless because if the jury did apply the natural and probable consequences theory, it would have done so by finding assault as the target crime, the only basis for proper application of the doctrine in any event.  (*Prettyman*, *supra*, 14 Cal.4th at pp. 273–274.)  However, unlike *Prettyman*, the jury here was not instructed to "determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether any other crime charged was a natural and probable consequence of such originally contemplated crime." (See *id.* at p. 272.)  The jury here was instructed:  "Under some circumstances if the evidence establishes aiding and abetting of one crime a person may be found guilty of other crimes that occurred during the commission of the first crime."  Therefore, unlike *Prettyman*, we do not conclude that

47.

the jury would have interpreted the language to permit it to convict defendant of murder based upon his aiding and abetting some other crime.

Therefore, we conclude the trial court's erroneous instruction as to the bracketed paragraph of CALCRIM No. 400 could not have been interpreted by the jury to permit them to convict defendant for aiding and abetting murder based upon Gustavo's malice rather than his own.

### 2. *Error Related to CALRIM No. 401*

#### a) **Aiding and Abetting Implied Malice Murder**

Defendant argues that the trial court erred because its aiding and abetting instructions permitted the jury to convict defendant even if he aided and abetted Gustavo without an intent to kill (express malice) and did so with implied malice. Defendant argues that a defendant cannot aid and abet a murder based on implied malice. We reject defendant's argument.

The Third District Court of Appeal rejected this identical argument in *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and again in *People v. Glukhoy*, *supra*, 77 Cal.App.5th 576. (Accord, *Langi*, *supra*, 73 Cal.App.5th at p. 979 ["Current law thus provides that the actual killer, or a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder."]; *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 499 [agreeing with *Powell* that a defendant can aid and abet implied malice murder].) We agree with *Powell*'s analysis.

In *Gentile*, the Supreme Court stated that "notwithstanding … [the] elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, *supra*, 10 Cal.5th at p. 850.) We

48.

understand this to mean that an aider and abettor who acts with implied malice can be guilty of murder entirely apart from the natural and probable consequences doctrine. Accordingly, we agree with *Powell* that we are bound by California Supreme Court precedent and *Gentile* precludes defendant's argument. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Powell* explains that direct aiding and abetting of implied malice murder is based on "the aider and abettor's own mens rea" that "must be personally harbored by the direct aider and abettor" and consists of "knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at pp. 712–713.) We agree that *Powell* is entirely consistent with *Gentile* in basing murder liability on the aider and abettor's own state of mind— conscious disregard for life. (See *People v. Superior Court (Valenzuela)*, *supra*, 73 Cal.App.5th at p. 499.)

We therefore reject defendant's argument that the trial court erred when instructing the jury regarding aiding and abetting as to both express and implied malice murder.

### b) CALCRIM No. 401 and Imputed Implied Malice

We have concluded that the trial court did not err in instructing the jury that defendant could aid and abet murder committed with either express malice or implied malice. (See *Powell*, *supra*, 63 Cal.App.5th 689.) The People, relying on *Powell*, concede that the jury instructions on aiding and abetting were not properly tailored to a theory of aiding and abetting implied malice murder, but argue any error was harmless. As we explain, we do not agree with *Powell* that CALCRIM No. 401 incorrectly sets forth aiding and abetting liability for implied malice murder or that it relieves the jury of finding that the aider and abettor acted with malice.

49.

*(1)*     Powell

In *Powell*, defendants Powell and Langlois were convicted of murder committed during their retaliation for the beating of their friend by the victim's son.  (*Powell*, *supra*, 63 Cal.App.5th at pp. 691–692.)  Forcibly entering the victim's home, the defendants mistook the victim for his son and beat him.  (*Id*. at pp. 692, 696.)  The victim died as the result of a stab wound inflicted by Powell.  (*Id*. at p. 692)  On direct appeal, *Powell* upheld the theory of aiding and abetting implied malice murder:  "Thus, if there was error here, it was not because the court instructed on an invalid theory of liability.  We note, however, that the instructions given here were not tailored for this theory."  (*Id*. at p. 714.)

In upholding the validity of the theory of aiding and abetting an implied malice murder, *Powell* reviewed "the analytical connection between *the act* or the actus reus and the mens rea elements of direct aiding and abetting liability and the actus reus and mens rea elements of implied malice murder."  (*Powell*, *supra*, 63 Cal.App.5th at p. 712.) *Powell* relied upon our Supreme Court's decision in *McCoy*, which addressed whether an aider and abettor could be guilty of greater homicide-related offense than the actual perpetrator.  (*Ibid*., citing *McCoy*, *supra*, 25 Cal.4th at p. 1114.)  In its analysis, *McCoy* concluded, "when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea."  (*McCoy*, at p. 1122.)

In upholding the theory of aiding and abetting implied malice murder, *Powell* explained that "[i]n the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct

aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. omitted.)

Langlois argued that the language of CALCRIM No. 401 "couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.) Recognizing that the term " 'the crime' " referred to murder, the court then held that "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder," but rather, "relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Ibid.*) The court then concluded, because "the aiding and abetting instructions here [CALCRIM No. 401] were not tailored for implied malice murder, the instructions were erroneous." (*Ibid*.) The court then concluded the error was harmless because the jury had been instructed on the natural and probable consequences doctrine.[28] (*Id*. at pp. 714–716.)

---

[28]     *Powell* was a direct appeal from a pre-Senate Bill 1437 conviction, not an appeal from the denial of a former section 1170.95 petition. (*Powell*, *supra*, 63 Cal.App.5th at pp. 710–711 & fn. 25.) The court held that the instructional error was harmless because former section 1170.95 did not apply to cases pending on direct appeal, and the court found that Langlois had almost surely been convicted not as a direct aider and abettor pursuant to the flawed instructions, but on a natural and probable consequences theory that was valid under pre-Senate Bill 1437 law. (*Powell*, at p. 714.) The court expressed no opinion as to the outcome of any future petition filed by Langlois pursuant to former section 1170.95. (*Powell*, at p. 711, fn. 25.)

In *Langi*, the court relied upon *Powell* to conclude that, while the court gave no instruction expressly based on the natural and probable consequences doctrine, the standard instructions on aiding and abetting were ambiguous and permitted the jury to find Langi guilty on a theory under which malice was imputed to him based solely on his participation in the crime. (See *Langi*, *supra*, 73 Cal.App.5th at p. 982.)

In so doing, *Langi* focused on two instructions given to the jury. CALJIC No. 8.31, as given to the jury, defined second degree murder as follows: " '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' " (*Langi*, *supra*, 73 Cal.App.5th at p. 981.) CALJIC No. 3.01, as given to the jury, provided: " 'A person aids and abets the commission … of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, … [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.' " (*Langi*, at p. 981.)

*Langi* reasoned that these instructions in combination "create[d] an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) The court explained that "[t]he aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts '*with knowledge of the unlawful purpose of the perpetrator*, and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' (CALJIC No. 3.01, italics added.) However, as noted above, the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death.

Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Langi*, at pp. 982–983.)

Langi criticized CALJIC No. 3.01 for not stating that the aider and abettor must have acted with conscious disregard for human life as was included in the definition of second degree murder. (*Langi*, *supra*, 73 Cal.App.5th at p. 983.) "Thus, under the instructions that were given, the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not appellant intended to aid or encourage [the victim]'s killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Ibid*.)

*Langi* concluded that the aiding and abetting instructions should have explained that an accomplice must have acted with the mental state of implied malice. (*Langi*, *supra*, 73 Cal.App.5th at p. 983.) "The standard aiding-and-abetting instruction given in *Powell*, a CALCRIM instruction identical in relevant substance to the CALJIC instruction used here [CALCRIM No. 401] [citation], was inadequate as applied to the crime of second degree murder because it did not clarify that an accomplice must personally harbor that mental state of implied malice. [Citation.] Similarly, nothing in the standard aiding-and-abetting instruction given here states that the accomplice himself must have acted with such knowledge and conscious disregard." (*Ibid*., fn. omitted.)

*(3)    CALCRIM No. 401 Correctly States the Law*

As *McCoy* recognized, a crime is comprised of an act (actus reas) committed with a mental state. (*McCoy*, *supra*, 25 Cal.4th at p. 1117.) As set forth in CALCRIM No. 520, murder is (1) a physical act that causes someone to die committed with an intent to kill, or (2) an act dangerous to human life that a person commits both knowing that the act is dangerous to life and deliberately disregarding that it is dangerous to life. Therefore, when CALCRIM No. 401 instructs that an aider and abettor must both know that the perpetrator intends to commit a crime *and* intend to help the perpetrator to commit the crime, the instruction explains to the jury that when the "the crime" is murder, the aider and abettor must know the perpetrator either (1) intends to kill someone or (2) intends to commit an act that is dangerous to human life and intends to commit the act by deliberately disregarding the perpetrator's own knowledge that the act could kill someone. Where the mens rea of the perpetrator is express malice (the perpetrator intends to kill), the aiding and abetting instruction, by substituting the definition of express malice murder, is then understood to require that the aider and abettor do or say something intending to help the perpetrator to kill. Where the perpetrator is acting with a mens rea of implied malice, by substituting the definition of implied malice, the instruction requires that the aider and abettor—who both knows that the perpetrator intends to commit an act dangerous to human life and knows that the perpetrator intends to disregard the danger to human life—to deliberately do or say something to help the perpetrator commit the dangerous act that they both know could kill someone.

We believe that *Powell*, while it might have articulated a different way of wording the elements of aiding and abetting murder committed with an intent of implied malice, was incorrect in concluding that CALCRIM No. 401 misstated its elements. We believe the court erred in concluding that "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder," but only need intend the perpetrator's act. (*Powell*, *supra*, 63 Cal.App.5th at p. 714.) While an aider and abettor to murder

54.

need not intend *to kill*, an aider and abettor must intend to commit murder, which is not limited to intent-to-kill murder. In fact, the Supreme Court in *Beeman* held that an aider and abettor must not only act with knowledge of the criminal purpose of the perpetrator, but also act with the intent or purpose either of committing or of encouraging or facilitating commission of *the offense*. (*Beeman*, *supra*, 35 Cal.3d at p. 560.) "When the definition of the offense includes *the intent to do some act or achieve some consequence beyond the actus reus of the crime* [citation], the aider and abettor must share the specific intent of the perpetrator. (*Id.* at p. 560, italics added.) "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime."[29] (*Beeman*, at p. 560.)

*McCoy* recognized that it's discussion of *Beeman* in *People v. Croy* (1985) 41 Cal.3d 1, page 12, footnote 5 "contained language that has caused some confusion: 'It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury.' " (*McCoy*, *supra*, 25 Cal.4th at p. 1118, fn. 1.) Limiting that statement to liability for an unintended crime under the natural and probable consequences doctrine, the court clarified, "Our reference to the 'target offense' should more accurately have been to the charged crime. When the charged crime and the intended crime are the same, i.e., when

---

[29]    The Supreme Court, rejecting an instruction that aiding and abetting does not require specific intent to facilitate the crime of robbery, "suggest[ed] that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Beeman*, *supra*, 35 Cal.3d at p. 561.)

guilt is *not* predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent."[30] (*McCoy*, at p. 1118, fn. 1.)

Although implied malice may not fall literally within the *Beeman* formulation of specific intent, our Supreme Court has previously recognized that the element of implied malice that requires that the defendant act with knowledge of the danger to and in conscious disregard of human life is closely akin to the definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state. (*People v. Whitfield* (1994) 7 Cal.4th 437, 450, superseded by statute on other grounds as stated in *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.) Therefore, CALCRIM No. 401 is a correct statement of *Beeman*'s holding that an aider and abettor must intend to aid and the abet the crime and is consistent with *Beeman*'s suggestion as to the appropriate language for an aiding and abetting instruction. (See fn. 30, *ante*, p. 56.)

Because murder is defined with two different intents, reference to "the crime" in the aiding and abetting instruction encompasses both the express malice and implied malice definitions of murder. *Powell* incorrectly interpreted the words "the crime" in the aiding and abetting instruction, where the crime is murder, to be limited to only express malice murder (committed with an intent to kill) with no discussion as to why a juror would so understand it. The aiding and abetting instruction referred to the object of an aider and abettor's intent and knowledge as "the crime," which a juror in this case would understand to be murder since it was the only crime charged, and the jury would look to

---

**30**     Because *McCoy* concluded that a perpetrator and aider and abettor could have differing mental states, the Supreme Court's use of the phrase "share the actual perpetrator's intent" appears to require that an aider and abettor must have the mental state required for the crime but not that the mental state be the same one possessed by the perpetrator. Murder is a crime committed with either of two mental states. Hence, the Supreme Court's caveat, "Because we cannot anticipate all possible nonhomicide crimes or circumstances, we express no view on whether or how these principles apply outside the homicide context." (*McCoy*, *supra*, 25 Cal.4th at p. 1122, fn. 3.)

the definition of murder in applying the instruction, which includes both express and implied malice.

Similarly, *Langi* also read the aiding and abetting instruction too constrictively. *Langi* interpreted the language of CALJIC No. 8.31, which in substance is substantially the same as *Beeman*'s suggested instruction language (compare *Langi*, *supra*, 73 Cal.App.5th at p. 981 with *Beeman*, *supra*, 35 Cal.3d at p. 561), as permitting conviction of an aider and abettor for murder if the perpetrator's "purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim" (*Langi*, at p. 982). We believe *Langi* erred in equating a perpetrator's reason or motive for committing an act to his criminal intent or purpose. *Beeman* explained that an aider and abettor " 'share[s]' " a perpetrator's intent when "he or she knows the full extent of the perpetrator's *criminal purpose* and gives aid or encouragement with the *intent or purpose of facilitating the perpetrator's commission of the crime*." (*Beeman*, at p. 560.) *Beeman* is discussing criminal intent, not motive. We do not believe that a jury would interpret the term "purpose" in the aiding and abetting instruction to refer to the motive or reasons a perpetrator committed a dangerous act, but rather would understand it as *Beeman* intended the term to be understood, as referring to the entire crime, including the mental states contained within the definition of murder, which can be either express malice or implied malice.

We find support for this analysis in *People v. Hardy* (2018) 5 Cal.5th 56 (*Hardy*). Hardy, on trial for murder, argued that the trial court did not properly instruct the jury that torture and aiding and abetting require specific intent. (*Id*. at p. 96.) The Supreme Court agreed that torture required the specific intent to " 'cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose,' " and aiding and abetting liability requires " 'the intent or purpose of committing, encouraging, or facilitating the commission of the offense.' " (*Ibid*.) Although the trial court inconsistently listed torture as a general intent crime during instruction, the

Supreme Court explained that the jury instruction on aiding and abetting was correct and the inconsistency did not mislead the jury. (*Ibid.*)

Regarding aiding and abetting, the trial court gave the standard instruction that " 'A person aids and abets the commission of a crime when he, 1. with knowledge of the unlawful purpose of the perpetrator; and 2. with the *intent or purpose* of committing or encouraging or facilitating the commission of a crime; and 3. by act or advice aids, promotes, encourages, or instigates the commission of the crime.' " (*Hardy*, *supra*, 5 Cal.5th at p. 96, quoting CALJIC No. 3.01.) Focusing on the " 'intent or purpose,' " Hardy argued that the jury could have understood " 'purpose' " as " 'something different from, and less than,' " the required specific intent. (*Hardy*, at p. 96.) The Supreme Court recognized that it had previously used that language in both *Beeman*, *supra*, 35 Cal.3d at page 561 and *People v. Mendoza*, *supra*, 18 Cal.4th at page 1123 and commented that, "[i]f anything, 'purpose' is a higher standard than 'intent.' " (*Hardy*, at p. 96, quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 172–173.) As to aiding and abetting, the Supreme Court held, "The court did not err in using the language we have used to describe the required mental state for aiders and abettors." (*Hardy*, at p. 96.)

We also find support in our conclusion by the Supreme Court's decision in *McCoy*. In *McCoy*, the Court of Appeal had a second and independent basis for Lakey's convictions—"the jury may have erroneously found McCoy acted with malice, it did not necessarily find that *any* participant acted with malice." (*McCoy*, *supra*, 25 Cal.4th at p. 1122.) The Supreme Court characterized this conclusion as "reflect[ing] a misunderstanding about the mental state needed for an aider and abettor (again, aside from the natural and probable consequences doctrine not relevant here)." (*Ibid.*) Because the trial court had instructed the jury both regarding direct perpetrator liability and aiding and abetting liability and also instructed on the malice requirement of murder, "To the extent the jury based its verdict as to Lakey on his personal acts, it necessarily

found malice. To the extent it based it on McCoy's acts—finding that Lakey aided and abetted those acts—it necessarily found that Lakey knew of McCoy's unlawful purpose and intended to commit, encourage, or facilitate that purpose. [Citation.] The only unlawful purpose charged here was an unlawful killing. Absent some circumstance negating malice one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice. (See generally *People v. Whitfield*[, *supra*], 7 Cal.4th [at p. ]450.) Whether or not McCoy killed in unreasonable self-defense, thus negating what would otherwise be malice as to him, McCoy's unreasonable self-defense would not negate the implicit jury finding that Lakey knowingly and intentionally helped McCoy commit the crime, which constitutes malice." (*McCoy*, at pp. 1122–1123.)

We conclude that CALCRIM No. 401 as applied to implied malice murder was legally correct and did not permit the jury to convict defendant unless it found that defendant acted with malice. If a juror believed that the perpetrator committed an act dangerous to human life and deliberately did so knowing it was dangerous to life, the aiding and abetting instruction required the jury to find that defendant knew that the perpetrator both intended to commit the act and that the perpetrator deliberately disregarded the known danger to human life in committing the act. We disagree with *Langi*'s conclusion that the instructions permitted the jury to conclude that defendant only intended to encourage the perpetrator's *intentional act*, because the instruction required the jury to find that defendant intended to encourage and assist the perpetrator to commit *the crime*, that being, both the dangerous act and the perpetrator's deliberate disregard that the act was dangerous to human life. A defendant who knows that a perpetrator is committing an act dangerous to human life in deliberate disregard to the danger cannot encourage the act without himself having chosen to similarly disregard the danger, and that is implied malice.

59.

*(4)     Harmless Error*

Even if the aiding and abetting instruction did not properly set forth the elements of aiding and abetting implied malice murder, we find any such error harmless. The harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies to errors based upon an invalid theory and jury instructions that omit or misstate an element of the offense. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*) [when a trial court instructs the jury on alternative theories of guilt and at least one theory is legally erroneous, the *Chapman* standard applies]; see *People v. Merritt* (2017) 2 Cal.5th 819, 827.)

Under *Chapman*, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) The People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24; see *Aledamat*, at pp. 12–13 ["Finding beyond a reasonable doubt that the error did not contribute to the verdict is essentially the same as finding the error harmless beyond a reasonable doubt."].)

One important consideration to our determination that the instructional error here was harmless is the fact that the prosecutor did not rely on the natural and probable consequences doctrine as we discussed in part I.C.1. of our discussion. (*Ante*, at pp. 41–48.) Additionally, the prosecutor did not rely on aiding and abetting implied malice murder and never advanced this argument. As we noted, the prosecutor advanced just two theories of liability as to defendant—that defendant either shot Reese and Duenas or that he directly aided and abetted express malice murder. Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless. (*Aledamat*, *supra*, 8 Cal.5th at p. 14 [although jury improperly instructed as to an invalid theory that a box cutter would be considered inherently deadly or dangerous,

60.

"no one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon"].)

Similarly, here, the prosecutor never argued an implied malice theory as to defendant. The prosecutor explained the definition of implied malice as intentionally pointing a gun at someone and pulling the trigger, an act dangerous to human life, and defendant would know the danger because everyone knows that. However, the prosecutor told the jury, "I'm not suggesting that this is what's going on here." He also explained that implied malice addressed a situation where an individual claimed to have shot at someone just to scare them and not trying to hit them, "[w]hich is not applicable here. [Reese] is shot right in the chest. Right here. That's an intent to kill." The prosecutor explained that Duenas's murder could be murder under an implied malice theory because defendant shot at Reese but Duenas was in front of Reese when he did so: "He's not meaning to hit [Duenas] but he's still shooting at [Reese]. And he accidentally hits [Duenas]. That could be murder under this implied malice theory." The prosecutor, however, explained to the jury the doctrine of transferred intent as "the more applicable and straightforward" way to convict defendant of Duenas's murder. The prosecutor asked the jury to find that defendant intended to kill and explained that defendant would still be guilty of killing Duenas if defendant intended to kill Reese and killed Duenas by mistake. The prosecutor explained that a defendant who shoots with the intent to kill is guilty of murder even if someone other than his intended victim dies.

When explaining aiding and abetting, the prosecutor prefaced his comments again by stating, "And I'm going to be just very up front with you on this. I'm asking you to find, and I believe the evidence is showing, that [defendant] was the shooter here," and, "So I want to make it very clear. Again, my request is that you find defendant the shooter here." But the prosecutor did not spend much of his argument addressing aiding and abetting and did not frame the argument as aiding and abetting implied malice murder. The prosecutor argued this theory to the jury in the words of CALCRIM No. 401:

61.

Assuming Gustavo pulled the trigger, the evidence showed that defendant knew Gustavo intended to commit the crime, defendant intended to aid and abet Gustavo to commit the crime before or during its commission, and defendant's words or conduct had the effect of assisting the crime. He then argued that while the crime was being committed, defendant indicated that he was aiding and abetting Gustavo by asking Gustavo, "Did you get him?" while Gustavo was checking to make sure that Reese had been shot. The prosecutor then reiterated that the jurors must either be convinced beyond a reasonable doubt that defendant perpetrated the murder or aided and abetted Gustavo to perpetrate the murder.

Under the circumstances of this case, given that the prosecutor relied upon the murders as having resulted from an intent to kill and never argued implied malice as the basis for murder even under an aiding and abetting theory, the jury may have believed that defendant shot Reese and Duenas with an intent to kill or aided and abetted a murder with an intent to kill. (See *Prettyman*, *supra*, 14 Cal.4th at pp. 272–273.) The evidence supported an argument that defendant perpetrated the murder as Lucas testified that he heard shots and then saw a man chasing Reese with a gun until Reese collapsed. The man then stood over Reese and kicked him, spat on him, and cussed at him. The jury could infer that the man with the gun was the man who shot Reese. The jury could infer the shooting was intentional based upon the man's act following the shooting and the second man's question, "Did you get him?" which the jury could infer demonstrated both a shared intent to shoot Reese and an intent to ascertain whether the shared intent had been carried out. Some jurors could have accepted the prosecutor's argument that Lucas's description of the shooter did not match Gustavo and, therefore, it must have been defendant who most closely resembled the description. While Lucas described the shooter as bald, the prosecution presented evidence that defendant had closely shorn hair near the time of the murders and defendant's statement to the police placed him at the murder scene in the same area where Lucas placed the shooter.

62.

However, Gustavo had GSR on his left hand, indicating that he either fired a gun, handled a fired gun, or was near the victims when the gun was fired. Defendant denied that he had a gun or fired the gun and identified Gustavo as the shooter. If any juror believed defendant was not the shooter, they could only have convicted on a theory of aiding and abetting, leaving the possibility that they relied on a theory of aiding and abetting murder. The jury found not true that defendant personally discharged a firearm during the commission of the crime, indicating at least one juror relied upon a theory of aiding of abetting murder to convict defendant. Therefore, we cannot conclude that evidence of defendant as the perpetrator was so overwhelming that a juror would not have convicted defendant as an aider and abettor by relying on the trial court's instruction.

As for direct aiding and abetting express malice murder, the evidence indicated defendant was worried that Duenas intended to confront Reese because Reese had a firearm. Defendant encouraged Gustavo to go after Reese to assist Duenas in his confrontation with Reese. Because both defendant and Gustavo believed that Reese had a gun, a juror could reasonably infer Gustavo would encounter armed resistance by going after Reese and that defendant knew this. Additionally, defendant knew that Gustavo had a gun when he encouraged Gustavo to get out of the car and go after Reese, even describing Gustavo to the detectives as "[h]e was like ready—ready—someone's gonna go down." Defendant told officers that he accompanied Gustavo when Gustavo got out of the car to confront Reese. Although he claimed to have run slower than Gustavo, defendant told officers that he was present and saw Gustavo shoot Reese.

Thus, the evidence supports the conclusion that even before the shooting, defendant encouraged Gustavo to confront Reese and knew that Gustavo would shoot Reese at close range, supporting an inference that defendant shared Gustavo's intent to kill. Such an inference is strengthened by defendant's statement to Gustavo, "Did you get him?" which indicates that defendant knew Gustavo intended to shoot Reese at close

63.

range or kill him and a shared intent in ascertaining whether Gustavo had accomplished this intent.  The inference that defendant intended for Gustavo to kill Reese and was aiding and abetting Gustavo is strengthened by evidence that Gustavo responded, "Yeah. Let's go."  Implicit in Gustavo's response is that defendant and Gustavo were acting together.

The People argue that any error in the aiding and abetting instruction was harmless because the evidence "strongly supported a finding that the direct perpetrator acted with express malice," given that Reese was shot in the chest, was not armed, was chased by the shooter who then kicked Reese, spat on Reese, and insulted Reese, and replied affirmatively when asked, "Did you get him?"  However, we are not convinced that the evidence was so overwhelming as to support a conclusion that all the jurors agreed that defendant was the perpetrator and, if not the perpetrator, that defendant shared Gustavo's intent to kill Reese and aided and abetted Gustavo with intent to kill.  Some members of the jury would have considered whether defendant acted with implied malice in aiding and abetting Gustavo.  Therefore, assuming that the aiding and abetting instruction was not properly tailored to a theory of implied malice, we must determine whether it was, nonetheless, harmless beyond a reasonable doubt.

*Aledamat* suggested various nonexclusive methods of evaluating prejudice. (*Aledamat*, *supra*, 8 Cal.5th at pp. 11–15.)  One such method is for the reviewing court to ask:  " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt*, *supra*, 2 Cal.5th at p. 827.)  The evidence leaves open the possibility that defendant did not intend for Gustavo to kill Reese but, nonetheless, encouraged Gustavo to shoot Reese during Reese's confrontation with Duenas, and Gustavo's act of shooting at close range as the two men struggled was an act dangerous to human life.  If a jury relied upon the theory of aiding and abetting, an act dangerous to human life, defendant would only be guilty if he knew of the danger and disregarded it in his encouragement of Gustavo's act.  In assessing the instruction's

inadequacy in requiring the jury to find that defendant knew of the danger to human life by firing a gun at the victims and then acted to aid and abet the perpetrator with conscious disregard of the danger, we examine whether defendant's knowledge that shooting someone with a firearm was dangerous to life was uncontested or supported by overwhelming evidence and find both circumstances to be present. (See *Merritt*, at p. 727 ["Where an instruction omits some elements of the offense or allegation, but the elements were uncontested and supported by overwhelming evidence, it would not necessarily follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt or innocence."].)

Defense counsel's closing argument did not contest whether shooting the victims with a gun was an act dangerous to human life, nor did counsel argue that defendant did not appreciate the risk to human life caused by his action. Defense counsel argued that neither defendant nor Gustavo shot the victims. Defense counsel argued that Reese had a gun. During a struggle, Duenas grabbed Reese's gun, shot Reese, and then Reese grabbed the gun and shot Duenas. According to defense counsel, Duenas went after Reese with tire iron, hit him, knocked the gun from Reese's hand, shot Reese, and somehow Reese was able to retrieve the gun and shot Duenas as he turned to run away. According to counsel, after the shooting, Gustavo walked up to Reese as he lay dying and kicked him, spat on him, and called him a name.

Defense counsel also argued that defendant was not the shooter because he did not match the Lucas's description. Defense counsel's briefing addressed the prosecution's theory of aiding and abetting by arguing that the only evidence of aiding and abetting was that someone said, "Did you get him?" a question which was after the shooting and, therefore, could not aid the crime. Defense counsel's argument never addressed implied malice murder.

The evidence that defendant appreciated the firearm's danger to human life was overwhelming. First, when describing the argument between Reese and Gustavo prior to

65.

the shooting, defendant described his efforts to discourage Gustavo from engaging with Reese, especially after Reese seemed to reach for a firearm when walking behind their car. Defendant told Gustavo to leave Reese alone in recognition of the danger inherent in a confrontation. Second, defendant expressed disbelief several times that Gustavo was not getting out of the car once Duenas left to confront Reese, who was armed: "And we were still in the car. I didn't—when we were still in the car I was looking at, um, Gustavo like why isn't he like getting off or like his dad is going towards [Reese]. And then all—he—he's not like—'cause if it was my dad I would've got off and—'cause I don't want nothing to happen to my dad. [¶] … [¶] … Knowing that [Reese] has a gun." In doing so, defendant recognized the risk inherent in confronting an armed man by stating, "I don't care if I get shot at." Defendant eventually told detectives that Duenas did not have a firearm, but he did not discuss the bullwhip or tire jack found near Duenas's body. Defendant's statements, therefore, reflected his awareness of the danger to Duenas resulting from a confrontation with Reese because Reese possessed a firearm.

In addition, defendant eventually admitted to detectives that Gustavo obtained a firearm from under his seat during the argument with Reese and defendant believed Reese had observed Gustavo reach for it. Defendant told the detectives that Gustavo did not show the gun to Reese but, "He just was like ready—ready—someone's gonna go down." Initially, defendant told officers that he encouraged Gustavo to get out of the car and follow Duenas after hearing shots fired. However, defendant eventually admitted that he had seen Gustavo reach for the gun under Gustavo's seat, knew that Gustavo was ready to use it, and that he had encouraged Gustavo to go after Reese and Duenas before hearing any shots. Defendant claimed that Gustavo ran to the two men, but that he followed Gustavo more slowly. Defendant said Reese shot Duenas and Gustavo shot Reese as Reese ran away.

The evidence from defendant's own statement to detectives evidenced that defendant knew he was encouraging Gustavo to engage in an armed confrontation that

66.

could result in someone's death. Therefore, if a juror concluded that defendant aided and abetted an act dangerous to human life as required for implied malice, that juror would have also concluded from the evidence that defendant encouraged Gustavo to confront Reese knowing both men were armed and disregarding the danger to human life that would result from an armed confrontation.

Therefore, even if we concluded that the direct aiding and abetting instruction was not tailored for implied malice murder, we find that it did not contribute to the verdict. (See *Aledamat*, *supra*, 8 Cal.5th at pp. 12–13.) In *People v. Chun* (2009) 45 Cal.4th 1172, superseded by statute as stated in *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–249, the Supreme Court upheld a second degree murder conviction even though the trial court erroneously instructed the jury on second degree felony murder as well as for implied malice. (*Chun*, at pp. 1178, 1205.) The court concluded that other aspects of the verdict and evidence left no reasonable doubt that the jury made the findings necessary for implied malice murder. (*Id*. at p. 1205) In that case, the trial court's murder instructions required the jury to find that defendant had the specific intent to commit the underlying felony of shooting at an occupied vehicle. (*Id.* at p. 1202.) Later, it instructed the jury that it needed to find the following elements to convict defendant of shooting at an occupied vehicle: "1. A person discharged a firearm at an occupied motor vehicle; and [¶] 2. The discharge of the firearm was willful and malicious." (*Id.* at p. 1205.)

"Thus any juror who relied on the felony-murder rule necessarily found that defendant willfully shot at an occupied vehicle. The undisputed evidence showed that the vehicle shot at was occupied by not one but three persons. The three were hit by multiple gunshots fired at close range from three different firearms. No juror could have found that defendant participated in this shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life—which is a valid theory of malice. In other words, on this evidence, no juror could find felony murder without also

67.

finding conscious-disregard-for-life malice.  The error in instructing the jury on felony murder was, by itself, harmless beyond a reasonable doubt." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1205.)

Having examined "the entire cause, including the evidence, and considering all relevant circumstances" (*Aledamat*, *supra*, 8 Cal.5th at p. 3), we conclude that a rational jury would have found defendant guilty of second degree murder absent the instructional error and any error in this regard was harmless beyond a reasonable doubt.

### 3.    *Other Instructional Errors*

We reject defendant's arguments that other instructions permitted the jury to impute Gustavo's malice to defendant.  Defendant argues that two of the trial court's instructions did not require the jury to find defendant acted with the requisite intent.  The court instructed the jury pursuant to a modified version of CALCRIM No. 251 (Union of Act and Intent: Specific Intent or Mental State) as follows:

> "The crimes and other allegations in—charged in this case require proof of the union or joint operation of act and wrongful intent.  For you to find a person guilty of the crimes in this case that person must not only intentionally commit the prohibited act but must do so with a specific intent.  The act and specific intent required are explained in the instructions for the crimes and allegations."

Additionally, the trial court instructed the jury pursuant to a modified version of CALCRIM No. 373 (Other Perpetrator) as follows:

> "The evidence shows that another person may have been involved in the commission of the crimes charged against the defendant.  There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial.  You must not speculate about whether that person has been or will be prosecuted.  Your duty is to decide the defendant on trial—pardon me.  Your duty is to decide whether the defendant on trial here committed the crimes charged."

According to defendant, these instructions "focused on the *person* who shot the victims and did not require the jury to find [defendant] committed the act with the requisite

intent." We do not agree. The last sentence specifically instructs the jury that their only job is to determine "whether the defendant on trial here committed the crimes charged." We cannot conclude that an intelligent juror could misunderstand this instruction or interpret it in such a way to focus on the guilt of the "person" who shot the victims as opposed to defendant.

Defendant also argues that while the trial court may have provided the jury with the legally correct definition of transferred intent pursuant to CALCRIM No. 562 in combination with other instructions, it "failed to inform the jurors that an aider and abetter must not only have aided and abetted the perpetrator to kill, they must specifically intend to kill." The trial court instructed the jury, "If a defendant intended to kill one person *or intended to aid and abet a perpetrator* to kill that person," then the crime is the same for the unintended killing. (Italics added.) The instruction clearly provides that defendant is responsible for the murder of an unintended victim if he *intended to aid and abet* a perpetrator *to kill* a specific person. We do not see how, in isolation, the jury would apply this instruction without finding that defendant intended to kill. Similarly, defendant has provided no authority that *Powell*'s criticism of CALCRIM No. 401 as to the elements for aiding and abetting implied malice murder has been applied to express malice murder.

The trial court's aiding and abetting instruction required the jury to find that the perpetrator committed murder, that defendant knew that the perpetrator intended to commit murder, and defendant intended to help the perpetrator commit murder. Under these instructions, the jury could only convict defendant of aiding and abetting express malice murder if it found that defendant both knew that the perpetrator intended to kill and defendant intended to help the perpetrator to kill. We do not agree that an intelligent jury would understand the transferred intent instruction would permit it to convict defendant of murder if he did not intend to kill.

69.

**II.    The trial court did not err in failing to sua sponte instruct the jury as to the natural and probable consequences doctrine.**

**A.    Background**

Defendant also argues that the trial court erred in not instructing the jury on the natural and probable consequences doctrine.  We reject this argument because the trial court had no duty to instruct on the doctrine sua sponte and because it is no longer a valid legal theory for conviction of murder.

**B.    Standard of Review and Applicable Law**

"The trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense."  (*Prettyman*, *supra*, 14 Cal.4th at p. 269.)  In the absence of a prosecutor's request, a trial court still must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  However, the natural and probable consequences doctrine is not one of the " 'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' "  (*Prettyman*, at p. 270.)

**C.    Analysis**

Defendant argues that the prosecutor relied upon this theory in his closing argument and, therefore, the trial court should have instructed on both the natural and probable consequences doctrine as a theory of aiding and abetting liability and the elements of robbery as the target offense.  As we concluded in part I.C.1. of our

discussion, the prosecutor did not argue the natural and probable consequence doctrine as a basis for convicting defendant of murder. (*Ante*, at pp. 41–48.)

We agree with the People that the prosecutor did not argue the natural and probable consequences doctrine or that the murders were not intended and resulted from a robbery. "[T]he use of the term 'natural [and probable] consequences' in the CALCRIM No. 520 definition of implied malice does not import into the crime of murder the case law relating to the distinct 'natural and probable consequences' doctrine developed in the context of aiding and abetting liability." (*People v. Martinez* (2007) 154 Cal.App.4th 314, 334.) It did not permit the jury to convict defendant of murder solely based on his participation in a lesser target crime. The prosecutor here did not rely on the natural and probable consequences doctrine and did not request that the jury be instructed with regard thereto. Because the natural and probable consequences doctrine was not an issue in this case, the trial court did not have a duty to instruct sua sponte on the doctrine. (*Prettyman*, *supra*, 14 Cal.4th at p. 270.)

We also reject defendant's argument for another reason. As we discuss in part I.B.1. of our discussion, after trial of this case, section 188 was amended (Stats. 2018, ch. 1015, § 2) and the natural and probable consequences doctrine is no longer a valid theory of liability for murder. (*Ante*, at pp. 36–38.) A postconviction change in the law invalidating a prosecution theory is the equivalent of a trial error because it means the jury was instructed on a legally invalid theory. (See *People v. Chiu*, *supra*, 59 Cal.4th at p. 158 [characterizing the error as instructional error], superseded by statute as stated in *Gentile*, *supra*, 10 Cal.5th pp. 838–839; *In re Martinez* (2017) 3 Cal.5th 1216, 1225–1226 [same, noting that the court's instructions allowing application of the natural and probable consequences doctrine as to first degree murder, which had been invalidated in *People v. Chiu*, allowed the prosecution to convict defendant on a "legally incorrect theory"].) Because the natural and probable

71.

consequence doctrine is no longer a permissible theory for conviction of second degree murder, we cannot find that the trial court erred in failing to so instruct the jury.[31]

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

PEÑA, J.

---

[31] We note that when defendant filed his opening brief, he was not permitted to raise this error on direct appeal because a postconviction petition pursuant to former section 1170.95 was the only method for obtaining relief from a murder conviction based upon the natural and probable consequences doctrine. (See *Gentile*, *supra*, 10 Cal.5th at p. 851.) As we addressed in part I.B.1. of our discussion, former section 1170.95 has been amended and defendant raises this issue in his supplemental brief. (*Ante*, at pp. 36–38.)